Opinion issued April 9, 2009 



 

 







In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-08-00548-CV

____________


ALEJANDRA QUIROZ


V. 


DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES






On Appeal from the 314th District Court 

Harris County, Texas

Trial Court Cause No. 2007-04365J






MEMORANDUM OPINION

 Appellant, Alejandra Quiroz, brings this accelerated appeal to challenge a
judgment that involuntarily terminated her parental rights to her daughter S.M., and
awarded managing conservatorship of S.M. to appellee, the Department of Family
and Protective Services (DFPS). In three issues on appeal, appellant contends the
evidence is legally and factually insufficient to support (1) termination of parental
rights for constructive abandonment, (2) the finding that termination of parental rights
was in the child's best interest, and (3) the appointment of DFPS as the sole managing
conservator of the child. We conclude the evidence is legally and factually sufficient
to support the termination of parental rights and that termination is in the child's best
interest. Therefore, we do not reach the award of conservatorship to DFPS. We
affirm.Background S.M. suffers from numerous health conditions, including respiratory disease,
chronic lung disease, cerebral palsy, muscle spasticity, vocal cord paralysis,
convulsions, seizures, gastro-electro-reflux disease, speech disorders, and mixed
incontinence. S.M.'s health conditions require special machinery and a feeding tube. 
At the time of trial, S.M., who was born September 29, 2005, was two years old,
functioned as a one-year-old, and required a wheel chair. 

 A. The Places Where S.M. Has Lived 

 On October 19, 2006, several reports were made to DFPS regarding Quiroz's
care of S.M. At that time, S.M. had been admitted to Memorial Hermann Hospital
because Quiroz could not afford to have the electricity turned on at her trailer and
S.M. required electricity for her feeding pump and oxygen. Subsequently, DFPS
opened a case for Family Based Safety Services. As part of the Family Based Safety
Services, DFPS provided Quiroz with a home-based therapist and daycare for
Quiroz's two older children, a four-year-old and a three-year-old. 

 Three months after the initial referral, DFPS received another referral on
January 15, 2007 when S.M. was readmitted to Memorial Hermann with a 106-degree
fever. The doctors stated that when S.M. arrived at Memorial Hermann, she was
dehydrated and lacking oxygen because Quiroz delayed getting prompt medical
attention for S.M. S.M.'s brain was damaged as a result of the lack of oxygen and she
had to be placed on a ventilator. The doctors at Memorial Hermann, who were
concerned about Quiroz's ability to properly care for S.M. if S.M. was returned to
Quiroz because Quiroz had missed multiple medical appointments, admitted S.M.
into Memorial Hospital for four months, from January 15 to May 3, 2007.

 Following the discharge from Memorial Hospital, S.M. was admitted into
Health Bridge Hospital, a special needs hospital for children, from May 3, 2007 to
August 9, 2007. Officials at Health Bridge also had concern that it would be
medically unsafe for S.M. to return home due to the lack of follow-up care and living
conditions. Health Bridge personnel noted that Quiroz had previously failed to bring
S.M. to important doctor appointments at Health Bridge and that S.M. had repeatedly
been returned to both Memorial Hermann and Health Bridge for the same symptoms
that may have been avoided with proper medical follow-up. Health Bridge also noted
that it had difficulty contacting Quiroz. 

 S.M. was released from Health Bridge to reside in a therapeutic foster home,
where she lived for about nine months from August 9, 2007 to the time of trial on
May 1, 2008, except for a two-week period of hospitalization from August 13 to 28,
2007. According to DFPS, the therapeutic foster home met all of S.M.'s needs. The
foster home was run by a single mother who was a nurse at Health Bridge. S.M's
foster mother arranged for other nurses to take care of S.M. while she was at work
since S.M. required full-time nursing care. 

 B. The Court Intervention for the Care of S.M.

 DFPS filed an original petition in May 2007 seeking emergency relief for it to
be temporary sole managing conservator of S.M. At the conclusion of the emergency
hearing, the court granted the petition. Later that month, the trial court held an
adversarial hearing, where Quiroz was present with counsel. The trial court ordered
Quiroz to participate in a psychiatric evaluation and to continue participating in
home-based therapy. 

 In June 2007, DFPS prepared a service plan in writing that was agreed to by 
Quiroz. The plan required Quiroz to continue to participate in home-based therapy
with home enrichment, participate in counseling, psychiatric evaluations, contact and
utilize available community resources, keep all appointments with the therapist and
the DFPS worker, and follow all recommendations and services offered by DFPS. 
Later that month, at a status hearing attended by Quiroz, her attorney, and a translator,
the court ordered Quiroz to abide by the service plan. The court also ordered Quiroz
to complete a psychological examination, to maintain stable housing and
employment, and to provide DFPS with her address and phone numbers. 

 Four months later, when Quiroz failed to appear at a permanency hearing, the
trial court ordered that she was "not to have access to [S.M.] until she comes to
court." That October 30, 2007 order was lifted four months later on February 26,
2008, when Quiroz presented herself at another permanency hearing. The court also
ordered that all previous orders issued by the court continue without modification. 

 Around April 2009, DFPS filed a First Amended Petition for Protection of a
Child and a Permanency Plan and Permanency Progress Report. The section of the
report concerning Quiroz's compliance with temporary orders and the service plan
stated that Quiroz "has not completed any services at this time." 

 C. The Evidence Introduced at Trial

 At the bench trial on May 1, 2008, DFPS sought to terminate Quiroz's parental
rights to S.M. for constructive abandonment and failure to comply with the court's
order specifying the actions she had to take for DFPS to return S.M. to her. See Tex.
Fam. Code Ann. § 161.001(1)(N), (O) (Vernon 2002). The trial consisted of
evidence from two witnesses, DFPS caseworker Sarah Panetski and Quiroz.

 Panetski's testimony described DFPS's plan that was designed to correct the
conditions of medical neglect that had brought S.M. into care. DFPS invited Quiroz
to attend medical appointments and do other things that were necessary for her to
learn how to properly care for S.M. Panetski said that, in her opinion, the plan was
reasonable, but Quiroz did not participate in any of the services. 

 Panetski told the court that Quiroz had not visited S.M., nor maintained
significant contact with S,M. in the year since S.M. was taken into care. Panetski
testified that Quiroz made no attempt to visit S.M. for a five to six month period
between May 2007 to October 30, 2007, when the trial court allowed Quiroz to visit
S.M. Quiroz also did not have contact with S.M. during the four month period of
time from October 30, 2007 to February 26, 2008, when the trial court have a no-contact order in place. The trial court issued the no-contact order because Quiroz
failed to appear in court and DFPS was unable to find Quiroz and her two other
children in her care, who were subsequently taken into DFPS care. Although the no-contact order was in place for four months, it would have been lifted earlier than that
had Quiroz simply presented herself to the court. Moreover, Quiroz did not try, either
through her attorney or through Panetski directly, to get in contact with the court to
say she wanted to visit S.M., even though Quiroz told Panetski that Quiroz was in
constant contact with Quiroz's attorney. When the trial court lifted the no-contact
order in February 2008, the trial court gave Quiroz the right to see S.M. during doctor
appointments, but Quiroz did not show up for a doctor's appointment. 

 Panetski testified that Quiroz was unable to provide a safe environment and
that she believed it was dangerous to return S.M. to Quiroz because she did not have
the medical training needed to care for S.M. Panetski noted that even with DFPS help
through Family Based Services, Quiroz had not been able to provide S.M. with a safe
environment. Specifically, Quiroz was invited to attend medical appointments and
do other things necessary to learn how to care for S.M., but she did not participate in
those opportunities. Additionally, S.M. came into DFPS care because Quiroz was not
taking adequate care of her even with Family Based Services providing nurses in
Quiroz's home for up to one hundred hours a week. 

 Panetski told the court that DFPS was familiar with Quiroz's first residence. 
This residence was found not suitable for S.M. and was the reason for S.M.'s
removal. Panetski was never able to locate Quiroz to conduct a second home study
after S.M. was taken into care because she was not given a valid telephone number
or address for Quiroz. Panetski testified she believed S.M. to be adoptable and that
the current foster caregiver was considering adopting S.M. The only other witness to testify was Quiroz. Quiroz testified that she did not
want her rights to S.M. terminated. In describing the events leading to S.M.'s
hospital admission in May 2007, Quiroz stated she had been caring for S.M. without
a nurse on a Sunday when S.M. came down with a fever. When she took S.M. to the
hospital she was told by a doctor that she had not brought her to the hospital quickly
enough. Quiroz testified inconsistently concerning whether she visited S.M. in the
hospital. At one point Quiroz said that, after DFPS took custody of S.M., she
attempted to see S.M. at the hospital without success. However, at another point
Quiroz testified that she had seen S.M. at the hospital but could not remember on how
many occasions. Quiroz stated she asked the caseworker if she could see S.M. 
Quiroz had gone to a medical appointment for S.M. that the caseworker had told her
about, but S.M. was never brought to the doctor's office. 

 With regard to her two other children in DFPS care, Quiroz testified that she
placed these children with a sister-in-law when she lost her job in August 2007
because she had no other place to leave them. Quiroz testified that she subsequently
obtained other employment and secured housing. However, when she tried to pick
up her children in January 2008, Quiroz learned that DFPS had taken them into
custody. Quiroz stated that DFPS informed her she would not be able to visit or
speak with her children until she spoke with the caseworker. 

 Quiroz testified that she was living in the same place as she did when S.M. was
taken into custody, and that no one from DFPS had been to her residence in the last
11 months to check on her living arrangements. However, Quiroz also testified that
she was living with the father of her unborn child for the last three months, and that
she did not know the address of this residence. Quiroz claimed she did not receive
any paperwork from DFPS until two months before trial. Quiroz stated she had not
done any of the services on the service plan because she did not know what to do
until the new DFPS caseworker told her. 

 Quiroz claimed she did have the knowledge to care for S.M. because she took
classes at the hospital. Quiroz stated she had participated in ongoing training to care
for S.M. since S.M.'s birth, but had not taken any training since DFPS had taken S.M.
Quiroz told the court that she knew how to run all the machines necessary to care for
S.M. Finally, Quiroz testified that she could care for S.M. if S.M. were returned to
her.

 At the conclusion of the bench trial, the trial court ordered Quiroz's parental
rights to S.M. terminated for constructive abandonment, found that termination was
in S.M.'s best interest, and awarded sole managing conservatorship to DFPS. See
Tex. Fam. Code Ann. §161.001(1)(N), (2). The court declined to grant termination
under Texas Family Code section 161.001(1)(O). The trial court also made an
independent finding that awarding conservatorship to DFPS was in the best interest
of S.M. 

 Quiroz timely filed a motion for new trial, a statement of appellate points, and
a notice of appeal. Among the issues Quiroz identified in her statement of points
were legal and factual sufficiency challenges to the predicate and best-interest
findings supporting termination. The trial court denied Quiroz's motion for new trial
and found Quiroz's appeal not to be frivolous. See Tex. Fam. Code Ann. §
263.405(d) (Vernon Supp. 2008).

Sufficiency of Evidence


 Appellant contends the evidence is legally and factually insufficient to
terminate her parental rights to S.M.

A. Standards of Review

 The burden of proof at trial in a termination-of-parental-rights case is by clear
and convincing evidence. Tex. Fam. Code Ann. § 161.001; In the interest of J.F.C.,
96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence'" means the
measure or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be established." Tex.
Fam. Code Ann. § 101.007 (Vernon 2002); In re J.F.C., 96 S.W.3d at 264. This
heightened burden of proof results in a heightened standard of review. In re S.M.L.,
171 S.W.3d 472, 476 (Tex. App.--Houston [14th Dist.] 2005, no pet.).

 When determining legal sufficiency, we review all the evidence in the light
most favorable to the finding "to determine whether a reasonable trier of fact could
have formed a firm belief or conviction that its finding was true." In re J.F.C., 96
S.W.3d at 266. To give appropriate deference to the factfinder's conclusions, we
must assume that the factfinder resolved disputed facts in favor of its finding if a
reasonable factfinder could do so. Id. We disregard all evidence that a reasonable
factfinder could have disbelieved or found to have been incredible. Id. This does not
mean that we must disregard all evidence that does not support the finding. Id. 
Disregarding undisputed facts that do not support the finding could skew the analysis
of whether there is clear and convincing evidence. Id. Therefore, in conducting a
legal-sufficiency review in a termination-of-parental-rights case, we must consider
all of the evidence, not only that which favors the verdict. See City of Keller v.
Wilson, 168 S.W.3d 802, 817 (Tex. 2005). In determining a factual-sufficiency challenge, the higher burden of proof in
termination cases also alters the appellate standard of review. In re C.H., 89 S.W.3d
17, 26 (Tex. 2002). "[A] finding that must be based on clear and convincing
evidence cannot be viewed on appeal the same as one that may be sustained on a mere
preponderance." Id. at 22. In considering whether evidence rises to the level of being
clear and convincing, we must consider whether the evidence is sufficiently
reasonable to form in the mind of the factfinder a firm belief or conviction as to the
truth of the allegation sought to be established. Id. at 23. We consider whether
disputed evidence is such that a reasonable factfinder could not have resolved that
disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d at 266. "If, in light
of the entire record, the disputed evidence that a reasonable factfinder could not have
credited in favor of the finding is so significant that a factfinder could not reasonably
have formed a firm belief or conviction, then the evidence is factually insufficient." 
Id. 

B. Constructive Abandonment

 A court may base a termination of parental rights upon findings that the parent
engaged in constructive abandonment of the child and that termination is in the best
interest of the child. See Tex. Fam. Code Ann. § 161.001; In re L.M., 104 S.W.3d
642, 647 (Tex. App.--Houston [1st Dist.] 2003, no pet.). In order to prove constructive abandonment, DFPS must prove that (1) it had
a permanent or temporary managing conservatorship of the child for at least six
months; (2) it made reasonable efforts to return the child to the parent; (3) the parent
did not regularly visit or maintain significant contact with the child; and (4) the parent
demonstrated an inability to provide the child with a safe environment. See Tex.
Fam. Code Ann. § 161.001(N). If no evidence exists for one or more of the above-mentioned elements, then the finding of constructive abandonment fails. In re D.T.,
34 S.W.3d 625, 633 (Tex. App.--Fort Worth 2000, pet. denied); see also In re H.R.,
87 S.W.3d 691, 699 (Tex. App.--San Antonio 2002, no pet.).

 Quiroz challenges only two of the four requirements for proving constructive
abandonment. It is undisputed that DFPS had been the temporary managing
conservator of S.M. for well over six months and that DFPS made reasonable efforts
to return S.M. to Quiroz. Quiroz challenges only the determinations that she did not
regularly visit or maintain significant contact with S.M., and that she demonstrated
an inability to provide S.M. with a safe environment. See Tex. Fam. Code Ann. §
161.001. 

 1. Regular Visits or Maintaining Significant Contact with S.M. 

 Quiroz contends that the evidence is legally and factually insufficient to show
that she did not maintain regular or significant contact with S.M. Specifically, Quiroz
asserts that her failure to visit S.M. was beyond her control because she had no
capability to visit S.M. from May 2007 through February 2008. In support of this,
Quiroz explains, (1) S.M. was hospitalized from May to August of 2007 and Quiroz
thought she could not visit S.M. in the hospital, and (2) from October 2007 until
February 2008, there was a court order in place that prohibited Quiroz from having
any contact with S.M. 

 At the outset, we note that Quiroz only claims an inability to see S.M. from
May to August 2007 and October 2007 to February 2008. Quiroz provides no excuse
or explanation for failing to see S.M. for the three months of September 2007, March
2008, and April 2008.

 The evidence fails to show that Quiroz could not have visited S.M. while she
was in the hospital for the four months of May through August 2007. No evidence
in the record supports the suggestion that Quiroz was prohibited from visiting S.M.
during S.M.'s stay at the hospital. Panetski's testimony that she had no knowledge
as to whether Quiroz was allowed to visit S.M. in the hospital is not evidence that
Quiroz was prohibited from visiting S.M.; it is only evidence of Panetski's lack of
knowledge as to whether Quiroz was allowed to visit S.M. at that time. Moreover,
Quiroz testified that she visited S.M. in the hospital, but could not remember how
many times. This testimony belies Quiroz's contention that she did not believe she
had the right to visit S.M. and that she was prohibited from visiting S.M. However,
Quiroz later contradicted her own testimony when she stated she had not seen S.M. 
Finally, Panetski testified that neither Quiroz nor her attorney contacted her
indicating that Quiroz wanted to visit S.M. until January or February of 2008, which
was approximately eight or nine months after S.M. was in the care of DFPS. 

 The evidence does not support Quiroz's contention that her failure to visit S.M.
for the approximately four month from October 2007 to February 2008 was due to the
court's order prohibiting the contact. Panetski testified that from October 30, 2007
until February 2008, a court order was in place prohibiting Quiroz from visiting S.M. 
The court ordered no contact between Quiroz and S.M. until such time as Quiroz's
other two children were brought into DFPS custody because DFPS had been unable
to locate the children and was concerned for their safety. Specifically, the court
conditioned Quiroz's access to S.M. "until [Quiroz] comes to court." This condition
does not support Quiroz's contention that she could not see S.M. based on factors
beyond her control, because, by the very nature of the order, Quiroz only had to come
to court in order to have the order lifted. Additionally, Panetski testified that when
Quiroz contacted her in January or February about visitation, Panetski advised her
that she needed to present herself to the court, resulting in the court lifting the order
to allow Quiroz to visit S.M. at doctor appointments. Although the court expressly
allowed Quiroz to visit S.M. during the doctors' appointments, Quiroz did not attend
appointments because Panetski had no valid contact information for Quiroz. Panetski
testified that when she was finally able to contact Quiroz, Quiroz did not ask about
visiting S.M. 

 The factfinder was free to disbelieve Quiroz's testimony given the
inconsistencies concerning whether she visited S.M. in the hospital. The factfinder
could reasonably believe Panetski's testimony that in the year since S.M. was taken
into DFPS's care, Quiroz had not visited S.M. nor had she attempted to maintain
significant contact with her. Viewing the evidence in the light most favorable to the
verdict, we hold that the fact finder reasonably could have formed a belief that Quiroz
did not regularly visit or maintain contact with S.M. See in re B.S.T., 977 S.W.2d
481, 486 (Tex. App.--Houston [14th Dist.] 1998, no pet.) (holding evidence
sufficient to support termination of parental rights on basis of constructive
abandonment where parent was advised of his right to visit, visited twice, but made
no further visitation efforts). In so holding, we distinguish In the interest of D.T., 34
S.W.3d 625, 633 (Tex. App.--Fort Worth 2000, pet. denied), upon which Quiroz
relies. In D.T., the termination of an incarcerated parent's rights for constructive
abandonment was reversed because it was DFPS's own policy that denied the parent
visitation with the child. In re D.T., S.W.3d at 629. In the instant case, the record
reveals no such policy on the part of DFPS denying Quiroz access to her child. On
the contrary, Quiroz merely had to come to court in order to have the temporary order
denying her access to S.M. lifted. The record reveals that when Quiroz did that, she
was allowed to visit S.M. Moreover, although the court's order denied contact for
the five months of October 2007 to February 2008, the court allowed Quiroz to have
contact for the seven months from May to September 2007 and March to April 2008,
and Quiroz did not maintain contact with S.M. during that time either.

 Quiroz also asserts that the evidence is factually insufficient to show that she
did not maintain regular or significant contact with S.M. Based on the foregoing
reasons, we likewise hold the evidence is factually sufficient for an order of
termination of parental rights. In re B.S.T., 977 S.W.2d at 486. Considering all of the
evidence in the record concerning Quiroz's contact with S.M., the fact finder
reasonably could have formed a firm conviction or belief that Quiroz lacked regular
visitation or significant contact with S.M. In re J.F.C., 96 S.W.3d at 264.

 2. Inability to Provide a Safe Environment

 DFPS was required to prove that Quiroz demonstrated an inability to provide
a safe environment for S.M. Quiroz contends that DFPS failed to offer any evidence
regarding the state of Quiroz's residence and its adequacy for S.M.'s needs. In
support of this, Quiroz notes that Panetski testified that no home study had ever been
conducted on Quiroz's residence and that DFPS did not present a medical
professional to testify regarding the circumstances surrounding S.M.'s admission to
the hospital in May 2007, S.M.'s needs since the hospitalization, S.M.'s current
condition, or S.M.'s current and future needs. 

 When viewing the evidence in a light most favorable to the verdict, the fact
finder could reasonably find that Quiroz was unable to provide S.M. with a safe
environment. Quiroz acknowledged her living situation was unstable during the year
S.M. was in her care. For instance, when asked whether she was living in the same
residence where S.M. was initially taken into DFPS care, she claimed that she was. 
However, Quiroz contradicted this testimony when she testified that she had recently
moved into a man's residence. Assuming Quiroz was still in the same residence
where S.M. was first taken into DFPS care, Panetski testified that DFPS was very
familiar with the residence because Quiroz was receiving family-based therapy there
and that the residence was not suitable. Even if Quiroz had moved from the house
where S.M. had lived with her, the evidence supports the implied determination that 
Quiroz could not provide a safe environment for S.M. Quiroz's testimony at trial
revealed that she did not know her own address and that she had to place her two
other children with an aunt when she "didn't have anywhere to leave them." 
Moreover, Panetski testified that she never received a valid address for Quiroz and
that she had to search to find her. 

 Although she did not have stable housing, Quiroz claimed she was capable of
caring for S.M. and Quiroz testified she had knowledge of how to care for S.M.'s
medical conditions. Quiroz testified that she knew how to take care of S.M. because
she received classes on how to run the machines at the hospital. Quiroz also stated
that she had electricity in her home and had a job. Quiroz did admit, however, that
she did not do anything outlined in her service plan to get S.M. back "until now." 

 In contrast to Quiroz's claim that she could care for S.M., Panetski testified that
S.M. came into care because Quiroz delayed seeking prompt medical attention for
S.M., and S.M. was dehydrated and lacking oxygen. Moreover, the Permanency
Progress Report introduced into evidence by DFPS reveals that the doctors at
Memorial Hermann Hospital were concerned about Quiroz's ability to properly care
for S.M. and that Quiroz repeatedly missed medical appointments. The Permanency
Report also indicated that officials at Health Bridge Hospital felt that it would be
medically unsafe for S.M. to return home after her initial hospitalization due to the
lack of follow-up care and living conditions. Finally, Panetski testified that, during
the time Quiroz was receiving Family Based Safety Services through DFPS, S.M. had
to be hospitalized for dehydration and severe malnutrition. Panetski concluded that
Quiroz was not able to provide a safe environment for S.M. in the past and, in her
opinion, would not be able to in the future. Panetski also testified that Quiroz had not
made any progress in learning how to care for S.M. Additionally, the service plan
also reflected a concern that Quiroz was unable to provide a safe environment for
S.M. because she could not adequately address S.M.'s medical needs. Panetski
testified that this plan was designed to correct the conditions of medical neglect that
brought S.M. into care. Panetski explained that Quiroz did not participate in the plan,
failed to go to S.M.'s medical appointments, and failed to learn how to properly care
for S.M.

 Based on the entirety of the testimony, the trier of fact could have reached a
firm belief or conviction that Quiroz lacked the ability and resources to provide a safe
environment for S.M. during the year S.M. was in DFPS care. While Quiroz testified
at trial that she was capable of caring for S.M., a reasonable trier of fact was entitled
to disbelieve that testimony in light of the evidence that indicated she had been
medically neglectful before, demonstrated a lack of resources and an inability to
maintain a safe environment while S.M. was in care, and received no medical training
since S.M. was taken into care. Thus, combining all of the evidence in the record, we
hold that the fact finder could have formed a firm belief or conviction that Quiroz was
unable to provide a safe environment for S.M. We hold that the evidence of Quiroz's
inability to provide S.M. a safe environment is legally and factually sufficient for the
finding of termination of parental rights. In re J.F.C., 96 S.W.3d at 264.C. Best Interest of the Child

 In order to show that Quiroz's parental rights should be terminated, DFPS was
also required to prove by clear and convincing evidence that termination was in the
best interest of S.M. See Tex. Fam. Code Ann. § 161.001(2). Quiroz asserts that
DFPS failed to present competent evidence to support its contention that termination
of Quiroz's parental rights was in S.M.'s best interests. This assertion is not
supported by the record.

 In determining whether termination of Quiroz's parental rights was in S.M.'s
best interest, we may consider several factors, including (1) the child's desires, (2) the
current and future physical and emotional needs of the child, (3) the current and
future physical danger to the child, (4) the parental abilities of the persons seeking
custody, (5) whether programs are available to assist the persons seeking custody in
promoting the best interests of the child, (6) plans for the child by the persons seeking
custody, (7) the stability of the home, (8) acts or omissions of the parent that may
indicate that the parent-child relationship is not proper, and (9) any excuse for acts
or omissions of the parent. Adams v. Tex. Dep't of Family & Protective Servs., 236
S.W.3d 271, 280 (Tex. App.--Houston [1st Dist.] 2007, no pet.) (citing Holley v.
Adams, 544 S.W.2d 367, 371-72 (Tex. 1976)). Not all of these factors need be
decided against the parent in order to find that termination is in the child's best
interest. Id.

 1. The current and future physical and emotional needs of the child

 Quiroz argues that she has a stable home and that she has shown her ability to
care for S.M. by taking care of S.M.'s special medical needs. Moreover, Quiroz
argues that simply because S.M. experienced multiple hospitalizations under Quiroz's
care does not mean that Quiroz was incapable of caring for her. Contrary to this
assertion, there was significant evidence that Quiroz could not provide a safe
environment for S.M.'s medical needs, as explained in more detail above. For
example, the Permanency Progress Report ,which was introduced into evidence,
noted that officials at both Memorial Hermann Hospital and Health Bridge Hospital
were concerned about Quiroz's abililty to care for S.M. The report noted that because
Quiroz delayed seeking prompt medical attention for S.M., S.M. received brain
damage resulting from lack of oxygen. Id. Furthermore, the report noted that S.M.
repeatedly returned to the hospital for the same symptoms that might have been
avoided with proper medical follow-up and that Quiroz continuously missed
important medical appointments for S.M. Id. Additionally, even when DFPS was
providing Quiroz with family-based services, Quiroz missed multiple medical
appointments and S.M. had to be hospitalized due to dehydration and malnutrition. 

 Failure to provide medical care, alone, has been found to support termination
of the parent-child relationship. See In the Interest of S.H.A., 728 S.W.2d 73, 87
(Tex. App.--Dallas 1987, writ ref'd n.r.e.). Moreover, inability or failure to provide
medical attention to the child, much like food deprivation, could sustain a charge of
parental neglect. Mitchell v. Davis, 205 S.W.2d 812-14 (Tex. Civ. App.--Dallas
1947, writ ref'd).



 2. The current and future physical danger to the child

 Quiroz asserts that DFPS introduced no competent evidence on this issue, and
therefore there is no evidence that supports the proposition that Quiroz is a danger to
S.M. Again, as previously discussed, there was ample evidence that Quiroz is unable
to provide proper medical care for S.M. and, therefore, S.M.'s placement with Quiroz
constitutes a danger to S.M., both now and in the future.

 3. The Desires of the Child

 The record does not reflect that S.M. is able to articulate a desire with respect
to her caregiving situation. However, Panetski testified that S.M. was doing well in
her therapeutic foster home placement and that all of her needs were being met. 

 4. Possibility of Emotional and Physical Danger

 As discussed previously, S.M. is a special-needs child and the evidence in the
record indicates that Quiroz repeatedly failed to attend the necessary doctors'
appointments for S.M. or to promptly seek medical care for her daughter. Such
failure to provide medical attention to S.M. could sustain a charge of parental neglect. 
See id.

 5. Acts or Omissions Indicating Improper Parent-Child Relationship


 From the minimal amount of parental visitation by Quiroz, as discussed earlier,
the finder of fact reasonably could have concluded that Quiroz was unstable and
lacked interest in S.M. Moreover, these factors could sustain a charge of parental
neglect. See id.

 6. Stability of the Home or Proposed Placement

 As previously discussed, the testimony revealed that Quiroz's home
environment was historically unstable and unsafe. Thus, the fact finder reasonably
could have concluded that Quiroz was unable to provide stability for S.M.'s life,
which has been found to be of paramount importance in a child's emotional and
physical well-being. See Hann v. Tex. Dept. of Protective and Regulatory Servs., 969
S.W.2d 77, 83 (Tex. App.--El Paso 1998, pet. denied). 

 On the other hand, the record shows that S.M. has resided continuously in a
therapeutic foster home since August 28, 2007. Panetski testified that S.M. was
adoptable and that the current foster caregiver was considering adopting her. 
Panetski testified that the current placement was meeting all of S.M.'s needs. Thus,
the judge reasonably could have concluded that S.M.'s new living arrangement
provides stability to S.M.'s upbringing. 

 7. Summary

 Viewing the evidence in the light most favorable to the verdict, we hold that
the fact finder reasonably could have formed a firm belief that termination of
Quiroz's parental rights was in the best interest of S.M.

 Quiroz also asserts factual insufficiency in finding that termination is not in the
best interest of S.M. Considering all of the evidence in the record, we hold that the
trier of fact reasonably could have formed a firm belief that termination of Quiroz's
parental rights was in the best interest of S.M. See id.; see White v. Tex. Dept. of
Family and Protective Servs., No. 01-04-00221-CV, 2005 WL 174546, at *9 (Tex.
App.--Houston [1st Dist.] Jan. 27, 2005, no pet.).

 We overrule Quiroz's first and second issues. Given our disposition of
Quiroz's first two issues, we do not reach Quiroz's third issue challenging the
sufficiency of the evidence supporting DFPS's appointment as sole managing
conservator. Likewise, we do not address DFPS's cross-point of error, that the trial
court erred in refusing to find that Quiroz failed to comply with the provisions of a
court order necessary for her to obtain the return of S.M. See Tex. Fam. Code Ann.
§ 161.001(1)(O).


 Conclusion


 We affirm the trial court's judgment.

 


 Elsa Alcala

 Justice


Panel consists of Chief Justice Radack, and Justices Alcala and Hanks.