

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**

**FORT WORTH**

**NO. 02-13-00244-CV**

IN THE INTEREST OF J.T.J.M. AND
J.M.-N.T.

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant J.T. (Mother) appeals the trial court's order terminating her parental rights to her children, J.T.J.M. (J.M.) and J.M.-N.T. (J.T.).[2] We affirm. *See* Tex. R. App. P. 43.2(a).

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for the children and their relatives throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

# I. BACKGROUND FACTS

Mother had two children: J.M., whose father was J.F.M. (Michael), and J.T., whose father was J.N. (Nelson). Mother, who earned a college degree in psychology, had a "long . . . history" with the Texas Department of Family and Protective Services (DFPS) regarding J.M. and J.T., which included "a pattern of inappropriate behavior and lack of cooperation" by Mother. Indeed, J.M. stated that it was "common" for them to move to avoid DFPS investigators: "[DFPS] comes to the house and we move. We moved five times."

Mother lived in a trailer home with her boyfriend (Bobby), J.M., and J.T. Bobby had an "extensive criminal history," including convictions for possession of marijuana, burglary of a habitation, assault of a family member with bodily injury, and driving while intoxicated. On April 12, 2012, when J.M. was thirteen years old and J.T. was nine years old, DFPS received a report that "marijuana [was] being dealt out of [Mother's] home" and that "the condition of the trailer they were residing in . . . [had] dog feces all over the floor, holes in the walls, doors off the hinges, and just concerns about the utilities as well." The report also stated that Mother had been high on drugs in front of J.M. and J.T.

Shanna Hartley, a DFPS investigator, went to J.M.'s and J.T.'s schools to speak with them about the report. J.M. was resistant and uncooperative, and J.T. denied the reported allegations. J.M. told Hartley that he did not have to "deal with" Hartley because Mother had "beat" DFPS in the past. Hartley then met with Mother, who also was uncooperative and intermittently hostile. Mother

2

told Hartley that she needed to speak with her father before she would answer Hartley's questions. Hartley left but returned a month later after Mother failed to contact Hartley about her willingness to cooperate as promised. Mother would not allow Hartley to enter the trailer, but Hartley noticed that the outside of the trailer, which was in an isolated area, was not well kept: "There were issues with the front door. It was broken at some point. There was . . . stuff in the front yard. . . . I know there was like a table, an outside table. There was a bucket and a water hose. . . . [Mother] was filling the bucket up with water from the water hose."[3] Mother denied the allegations raised in the report and explained that the inside of the trailer had been dirty because "the dog had been sick at one point and that he had had accidents on the floor." Hartley requested that Mother take a drug test, but Mother refused to do so. It appears this investigation was closed.

On July 12, 2012, DFPS received a second report regarding the conditions J.M. and J.T. were living in. Specifically, the report alleged that (1) Mother had been seen with track marks on her arms from intravenous drug use, (2) Bobby had forced J.M. to drink beer, (3) Bobby had forced J.M. to put on hockey pads so Bobby could hit J.M. "until [Bobby] was no longer upset with whatever situation he was upset about," (4) J.M. and J.T. were left alone with Bobby, and (5) "there were roaches, raw sewage, and feces" in the trailer. Hartley spoke with Nelson, who expressed concern for J.M., his stepson, and J.T., his

---

[3]The report also suggested that the trailer did not have "food or sterile drinking water," which Hartley could not confirm.

3

daughter. Hartley located Mother at her father's house, but Mother refused to cooperate until she could speak with her attorney. At this point, Hartley believed the children could be in jeopardy and began to seek the removal of J.M. and J.T.

On July 27, 2012 shortly after J.M. turned fourteen, Nelson and J.M. went to a DFPS office to report problems with J.M. and J.T.'s living situation. Lishawa Jackson, a DFPS investigator supervisor, talked to J.M. and learned that Mother and Bobby were using drugs in front of J.M. and J.T., Bobby and Mother had verbal and physical fights in front of J.M. and J.T., and Bobby had been physically violent with J.M. J.M. also reported that the trailer was "filthy." J.M. did not feel safe in the home and did not want to return to live with Mother and Bobby. J.M. admitted that he previously had lied to Hartley because Mother told him DFPS would send him "across country or to another state."

On August 8, 2012, two DFPS investigators, Larry Reynolds and Andrea Pickard, went to Mother's trailer. Bobby answered the door but would not allow Reynolds or Pickard to enter the trailer. Likewise, Mother would not allow them to come inside the trailer or talk to J.M. and J.T., who Reynolds believed he heard inside the trailer. This increased Reynolds's concern for J.M.'s and J.T.'s welfare. While Bobby was talking to Reynolds and Pickard, Reynolds noticed a marijuana pipe lying on the edge of the porch.

The next day, DFPS filed a suit affecting the parent-child relationship (the SAPCR), requesting permission to take possession of J.M. and J.T. and the termination of Mother's, Nelson's, and Michael's parental rights. *See* Tex. Fam.

4

Code Ann. § 262.101 (West 2008). The trial court entered an emergency order for J.M. and J.T. to be removed immediately from Mother's care. *See id.* § 262.102 (West Supp. 2013).

A full adversary hearing was held on September 5, 2012, at which the attorney representing DFPS, Mother, Nelson, Helene Parker (J.M. and J.T.'s attorney ad litem), and Mary Cartwright (J.M. and J.T.'s guardian ad litem) appeared. Michael was not present at the hearing because DFPS had difficulty locating him and had not yet served him with the SAPCR. After the hearing, the trial court entered the following findings:

> (1) there was a danger to the physical health or safety of the children which was caused by an act or failure to act of the person entitled to possession and for the children to remain in the home is contrary to the welfare of the children; (2) the urgent need for protection required the immediate removal of the children and reasonable efforts consistent with the circumstances and providing for the safety of the children, were made to eliminate or prevent the children's removal; and (3) reasonable efforts have been made to enable the children to return home, but there is a substantial risk of a continuing danger if the children are returned home.

*See* Tex. Fam. Code Ann. § 262.201(b) (West Supp. 2013). The trial court also entered temporary orders that appointed DFPS as temporary managing conservator of J.M. and J.T., limited Mother's and Nelson's access to J.M. and J.T., and required Mother and Nelson to pay child support and submit to a home study. *See id.* § 105.001 (West 2008). DFPS placed J.M. and J.T. in foster care with Nelson's parents. *See id.* § 262.201(e).

5

The temporary orders required Mother to attend counseling sessions "to address the specific issues that led to the removal of the child[ren] from the home and any additional issues arising from the drug and alcohol evaluation or from the counseling sessions to include anger management." Mother further was required to attend parenting classes; participate in a drug and alcohol assessment; participate in a "Choosing Healthy Relationships" class; attend five "AA/NA meetings per week"; submit saliva, urine, and hair samples to DFPS on its demand for random drug testing; and "maintain suitable employment for a period of at least six months and continuing through the pendency of this suit."[4] Mother acknowledged that she understood the temporary orders and that she would be "responsible for adhering to the order."

At Mother's first hair-follicle test, which occurred shortly after the full adversary hearing, she tested positive for cocaine, codeine, and morphine. After the full adversary hearing, DFPS assigned "more permanent" caseworkers, Megan Hildewig and Jessica Davis, to facilitate reunification or termination. Davis prepared a family-service plan that listed several "tasks" Mother needed to complete to meet her goal of reunification with J.M and J.T. *See id.* §§ 263.101–.102 (West 2008). These tasks included the requirements of the trial court's temporary orders. Mother never signed the family-service plan because Davis

---

[4]Nelson also was ordered to participate in similar services.

could not locate her.[5]  When Mother appeared for a supervised visit with J.M. and J.T., Davis attempted to review the plan with Mother; however, Mother left the office and did not return.  Indeed, Mother admitted she failed to complete the service plan but did not believe her rights would be terminated if she did not follow the plan.

Although Mother had approximately thirty-seven opportunities to have supervised visits with J.M. and J.T. during the nine months between the full adversary hearing and the termination trial, she only visited them approximately five times.  Indeed, Mother occasionally would confirm a supervised visit only to not show up.  Mother's failure to visit her children angered J.M. and disappointed and saddened J.T.[6]  Mother only attended six AA/NA meetings.  Mother believed that it was "good" to violate this provision of the trial court's temporary orders because she did not want to be around "all that drug talk."  Mother averred she had been seeing a counselor but she refused to give DFPS any information about her.  Mother also did not take the parenting classes or secure steady employment as required by the temporary orders.  Mother acknowledged, however, that "meetings and counseling and NA" would help her care for J.M. and J.T.  Even with these violations, Davis told Mother that there was still "hope"

---

[5]DFPS later mailed a copy of the service plan to Mother and Mother's attorney once she was located.

[6]J.T. continued to have regular visits with Nelson.

7

she could keep J.M. and J.T. if she could show an attempt at compliance; however, Mother did nothing.

J.M. and J.T.'s counselor, Tiffany Reves, stated that J.M. was very angry with Mother because Mother would not protect him from Bobby and because Mother used drugs. Both J.M. and J.T. told Reves that they believed Mother chose drugs over her relationship with them. Reves noticed that J.M. and J.T. improved after they were placed with Nelson's parents. Reves saw no progress or change in Mother. J.M. and J.T. told Reves that they wanted Mother to voluntarily waive her parental rights so they could have a more stable and structured existence. It appears, however, that J.M. and J.T. believed they could talk to their mother more if her parental rights were terminated because DFPS would not be involved and because Mother had difficulty complying with the requirements of the temporary orders and the service plan. In fact, they repeatedly told Nelson's mother that "they want this to be over."

After a status hearing and two permanency hearings, none of which Mother attended, the trial court set the SAPCR for trial.[7] *See id.* §§ 263.202, 263.306 (West Supp. 2013), § 263.401 (West 2008). DFPS proceeded to seek termination of Mother's parental rights based on subsections (1)(D), (1)(E),

---

[7]In the subsequent orders entered after these hearings, the trial court specifically approved DFPS's family-service plans and made them orders of the court. We will refer to the family-service plans and the temporary orders simply as "the trial court's orders."

(1)(N), and (1)(O) of section 161.001.  *See id.* § 161.001(1) (West Supp. 2013).

DFPS also sought termination of Michael's parental rights, but not Nelson's.

At the trial, which Mother sporadically attended, Mother testified and admitted that she failed to comply with the trial court's orders.  She believed J.M. lied to Jackson and Cartwright (the GAL) about his and J.T.'s living conditions because he was angry with her and did not want to "share" Mother with Bobby. Mother claimed that she was no longer involved with Bobby, that she was in constant contact with J.M. and J.T. through text messages and Facebook posts, and that she had cleaned the trailer.  She also stated that she and J.T. wrote in and exchanged journals as a way to communicate with each other.  Mother explained that she did not attend the pretrial hearings and parts of the trial because she was "intimidated" and because she was represented by an attorney. Although Mother testified that her family would help her if her parental rights were not terminated and that she would be able to meet J.M.'s and J.T.'s needs, she conceded that she had made no arrangements for insurance for J.M. or J.T. and did not have steady employment, both of which were violations of the trial court's orders.  Mother claimed that shortly before trial, J.T. hugged Mother and whispered that she wanted to "come home."  In fact, Mother testified that J.M. and J.T. did not want her parental rights terminated.

Mother's father testified that Mother had been drug free since January 2013.  He further stated that J.M. confessed that he had lied to Jackson about Bobby's physical abuse.  Mother's friend, Beverly Kuypers, testified that

9

termination would not be in J.M.'s and J.T.'s best interest because Mother is "one of the best moms I know" when she is sober. Even so, Kuypers had "grave concern" for J.M. and J.T. Kuypers saw mother "stoned" around J.M. and J.T. and recounted that J.M. asked Kuypers to get him and J.T. away from Mother. Further, Kuypers testified that J.M. also told her about the hockey-pad incident with Bobby, that Mother put Bobby's interests before J.M.'s and J.T.'s, and that he had seen marijuana in Mother's trailer.

The GAL recommended at trial that Mother's parental rights be terminated. She observed approximately three visits between Mother, J.M., and J.T. Although the GAL observed a strong bond between Mother and J.T., both J.M. and J.T. told the GAL that they wanted Mother's parental rights to be terminated. But J.T. did express that she wanted to continue to see Mother. Hildewig testified that DFPS recommended termination of Mother's parental rights because it was in the best interest of J.M. and J.T. She further emphasized that Mother accomplished none of the tasks set forth in the trial court's orders. Similarly, Davis testified that Mother did nothing to comply with the trial court's orders, failed to show up for two permanency conferences, failed to consistently contact or visit J.M. and J.T., and could not provide J.M. and J.T. with a good environment. Further, Davis stated that it was inappropriate for Mother to leave J.M. and J.T. alone with Bobby.

Nelson testified that J.M. and J.T. need "closure" and that he thought terminating Mother's parental rights was in J.M.'s and J.T.'s best interest. Nelson

stated he has been supporting his parents in their efforts to raise J.M. and J.T. Nelson confirmed that he would not prevent J.M. and J.T. from seeing Mother if her parental rights were terminated but that it would be dangerous for J.M. and J.T. to be with Mother in her current state. Nelson testified that he completed the parenting class, attended AA meetings, never missed a visitation with J.M. and J.T., held down a full-time job, and did not fail any drug test. Nelson's mother also testified that termination of Mother's parental rights would be in J.M.'s and J.T.'s best interest.

Eleven of the twelve jurors found that (1) termination was in J.M.'s and J.T.'s best interest and (2) Mother (a) knowingly placed or allowed J.M. and J.T. to remain in conditions or surroundings that endangered their physical or emotional well-being, (b) engaged in conduct or knowingly placed J.M. and J.T. with persons who engaged in conduct that endangered the physical or emotional well-being of J.M. and J.T., (c) failed to comply with the trial court's orders establishing the actions necessary for Mother to obtain J.M.'s and J.T.'s return, and (d) constructively abandoned J.M. and J.T. The trial court entered a final order of termination terminating Mother's parental rights to J.M. and J.T.:

> Based upon the jury's verdict and the evidence submitted at trial, the Court finds by clear and convincing evidence that termination of the parent-child relationship between [Mother] and [J.M. and J.T.], the children the subject of this suit, is in the children's best interest.

> The Court finds by clear and convincing evidence that [Mother] has:

11

knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children;

engaged in conduct, or knowingly placed the children with persons who engaged in conduct, which endangered the physical or emotional well-being of the children;

failed to comply with the provisions of a Court order that specifically established the actions necessary for the mother to obtain the return of the children who have been in the temporary managing conservatorship of [DFPS] for not less than nine months as a result of the children's removal from the parent . . . for the abuse or neglect of the children; and

constructively abandoned the children who have been in the temporary managing conservatorship of [DFPS] or an authorized agency for not less than six months and: (a) [DFPS] . . . has made reasonable efforts to return the children to the mother; (b) the mother has not regularly visited or maintained significant contact with the children; and (c) the mother has demonstrated an inability to provide the children with a safe environment.

*See* Tex. Fam. Code Ann. § 161.206 (West 2008). The trial court also terminated Michael's parental rights to J.M. by default. *See id.* § 161.002(b) (West 2008). The trial court appointed DFPS as J.M. and J.T.'s managing conservator. *See id.* § 161.207 (West 2008).

Mother filed a motion for new trial, arguing that the evidence was legally and factually insufficient to support the trial court's termination judgment. *See* Tex. R. Civ. P. 324(b). The motion was overruled by operation of law. *See* Tex. R. Civ. P. 329b(c). Mother then filed a timely accelerated appeal. *See* Tex. R. App. P. 26.1(b), 28.4(a)(1). Michael did not appeal the termination of his parental rights to J.M.

12

## II. LEGAL CONSIDERATIONS IN PARENTAL-TERMINATION CASES

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures."  *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. § 161.001 (West Supp. 2013), § 161.206(a) (West 2008); *E.N.C.*, 384 S.W.3d at 802.  "[C]onjecture is not enough."  *E.N.C.*, 384 S.W.3d at 810.  Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'"  *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802.  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of

the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, DFPS must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.— Fort Worth 2012, no pet.).

### III. DISCUSSION

#### A. SUFFICIENCY OF THE EVIDENCE

#### 1. Standards of Review

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable fact-finder could have done so. *Id.* We disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We consider undisputed evidence even if it is

14

contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the fact-finder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the fact-finder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated subsection (1)(D), (1)(E), (1)(N), or (1)(O) of section 161.001 and that the termination of the parent-child relationship would be in the best interest of the children. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

15

## 2. Section 161.001(2): Best Interest

In her first issue, Mother argues that the evidence was legally and factually insufficient to support the jury's finding that termination of her parental rights was in the best interest of J.M. and J.T. There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection-(1) ground and the best-interest determination. *C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

(A)  the desires of the child;

(B)  the emotional and physical needs of the child now and in the future;

(C)  the emotional and physical danger to the child now and in the future;

(D)  the parental abilities of the individuals seeking custody;

(E)  the programs available to assist these individuals to promote the best interest of the child;

(F)  the plans for the child by these individuals or by the agency seeking custody;

16

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *E.N.C.*, 384 S.W.3d at 807; *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors").

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

The evidence at trial showed that J.M. and J.T. told multiple people that they wanted Mother's parental rights terminated. Although their understanding of the effect of termination was contradictory at times, they consistently expressed that they wanted stability and that continued contact with Mother would not achieve that. J.M. and J.T. received their desired stability with Nelson's parents. J.M. expressed that he did not feel safe with Mother. Reves, Nelson, Davis, and Kuypers testified that J.M. and J.T. had improved since being removed from Mother and placed with Nelson's parents. Indeed, J.M. had been failing school

17

and J.T. had "not a lot of involvement or excitement about school" when they lived with Mother. Once they were placed with Nelson's parents, J.M.'s grades dramatically improved, and J.T. became less anxious. Kuypers, Nelson, and Davis stated that Mother could not provide J.M. and J.T. with a safe and stable environment. Further, Mother admitted that she failed to comply with the trial court's orders. Although Mother testified that she was no longer using drugs, a hair strand drug test that was administered a week to two weeks before trial was positive for cocaine, indicating that Mother had used cocaine within the previous ninety days. She further conceded that she had been arrested in October 2012 for possession of a controlled substance and that she had been high around J.M. and J.T. in the past. Hildewig, Nelson, Nelson's mother, and Davis testified that it would be in J.M. and J.T.'s best interest to terminate Mother's parental rights.

Considering the relevant factors, we hold that, in light of the entire record, and giving due consideration to evidence that the jury reasonably could have found to be clear and convincing, the jury reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in J.M.'s and J.T.'s best interest. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (holding "stability and permanence" found in foster care and children's improving condition sufficient to support best-interest finding); *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.— Houston [1st Dist.] 2007, no pet.) (considering children's stated desire to remain with foster family supportive of best-interest determination); *In re S.B.*, 207

18

S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (holding that evidence of parent's failure to comply with family-service plan supported finding that termination was in child's best interest); *Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past."). We overrule issue one.

### 3. Section 161.001(1): Prohibited Actions

In issues two, three, four, and five, Mother challenges the legal and factual sufficiency of the evidence to support each section-161.001(1) ground alleged by DFPS and found by the jury. Here, the trial court concluded, based upon the jury findings, that clear and convincing evidence supported four of section 161.001(1)'s prohibited actions: (1)(D), (1)(E), (1)(N), and (1)(O). We need only conclude that one of the prohibited actions listed in section 161.001(1) was supported by sufficient evidence. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

In her fifth issue, Mother asserts that the evidence was legally and factually insufficient to support the finding that Mother failed to comply with the provisions of a court order that "specifically established the actions necessary for [her] to obtain the return" of J.M. and J.T. Tex. Fam. Code Ann. § 161.001(1)(O).

19

Mother focuses her argument on the fact that the counseling providers listed in the trial court's orders were either no longer under contract to provide services in DFPS cases or contained incorrect contact information. But Mother admitted at trial that she did not attend the required AA/NA meetings, intentionally missed multiple supervised visits with J.M. and J.T., failed to attend parenting classes, and did not find and keep a full-time job for six months; all of which were mandated in the trial court's orders. In further violation of the trial court's orders, the record shows that Mother failed to pay the child support ordered by the trial court and was arrested in October 2012 for possession of a controlled substance. Although Mother testified that she did not believe noncompliance with the trial court's orders would result in the termination of her parental rights, the orders specifically and repeatedly provided (in all capitals and bold type) that noncompliance could result in termination. Further, Davis counseled Mother that she could avoid termination if she attempted to comply with the trial court's orders; however, Mother continued to be noncompliant. This evidence was legally and factually sufficient to allow the fact-finder to determine that Mother failed to comply with the trial court's orders as required to gain the return of J.M. and J.T. We overrule issue five.

## IV. CONCLUSION

Because legally and factually sufficient evidence supported the fact-finder's conclusions that Mother violated section 161.001(1)(O) and that termination was in J.M.'s and J.T.'s best interest under section 161.001(2), we

20

overrule issues one and five. Because we overrule issue five, we need not address issues two, three, and four. *See A.V.*, 113 S.W.3d at 362. As such, we affirm the trial court's judgment.

LEE GABRIEL
JUSTICE

PANEL: WALKER, MCCOY, and GABRIEL, JJ.

DELIVERED: December 19, 2013