**Opinion issued May 6, 2014**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

## NO. 01-13-00970-CV

———————————

## IN THE INTEREST OF T.M.D., JR., B.M.D., Z.T.D., AND E.M.D., CHILDREN

---

### On Appeal from the 312th District Court
### Harris County, Texas
### Trial Court Case No. 2007-02141

---

### MEMORANDUM OPINION

Appellant L.M. appeals from the trial court's decree terminating her parental

rights to her children: T.M.D., Jr., B.M.D., Z.T.D., and E.M.D. In five issues, she

argues that the evidence is insufficient to support the court's findings on any of the

four predicate acts that the court found were satisfied or that termination of her parental rights was in the best interest of the children.

We affirm.

## Background

L.M. is the biological mother of the four special-needs children at issue in this appeal: T.M.D., Jr., B.M.D., Z.T.D., and E.M.D. These children were aged 7, 6, 5, and 4, respectively at the time the Texas Department of Family and Protective Services interceded and removed them from their parents' care. Ultimately the trial court ordered the termination of the mother's parental rights, and it is from this decree that she appeals. The trial court's decree also terminates the parental rights of the children's father, T.D., but he does not appeal, and thus we focus our discussion and analysis on the mother.

Prior to the events that gave rise to this case, the attorney general initiated a suit affecting the parent-child relationship pursuant to Chapter 233 of the Texas Family Code. In December 2006, by an Agreed Child Support Review Order, T.D. was adjudicated as the father of T.M.D., Jr. and B.M.D., and the mother and father were appointed as joint managing conservators of the children. As of this time, Z.T.D. and E.M.D. had not yet been born. The mother was given the right to determine the children's residence without regard to geographic location. Although the order included "child support guideline findings," because the parents were

2

living together as a family at the time the order was entered, the trial court made no orders as to child support except to admonish both parents "to provide support, to the best of their abilities."

Approximately four-and-a-half years later, in July 2011, the trial court entered an order modifying the 2006 order. Among other things, this new order adjudicated T.D. as the father of two additional children, Z.T.D. and E.M.D. Both parents were again named joint managing conservators, but the father was designated as having the exclusive right to designate the primary residence of the children in Harris County or any contiguous county. The order provided the mother with periods of unsupervised access and possession and stated on its face that it could be enforced by a peace officer. The order recited that the father was allowing the mother to reside with him, but he was seeking ongoing monetary support. The trial court found that the father was unemployed and was obligated by a court order to provide medical and child support for another child who was not before the court. The mother was ordered to pay child support to the father on a graduated schedule which declined as each of the four children reached the age of majority. Income withholding orders were included in the court's order.

The family lived together until the father forcibly removed the mother from the home in April 2012. Around that time, the parents "argued a lot," and the mother sometimes feared for the children's safety. She testified that she left the

home with them on several occasions because the father "got really loud and rambunctious quite often and I couldn't have my children around it." The mother's testimony about the father's treatment of the children was somewhat contradictory. She initially testified that the children told her that he had abused them physically and verbally, but she later testified that they told her that he had abused them verbally but not physically. She said, "They had only stated they got a whopping and put in time out. They didn't exaggerate to what extent because they are so small." She also testified that she witnessed the father verbally abusing the children, but she did not see him physically abuse them. She testified that the last time any of the children reported such abuse to her was in March 2012 "before he had kicked me out." Her testimony was unclear about dates; she initially testified that she resided with the father and the children until she was removed from the home in 2011, but she later said it was 2012, just before the Department became involved.

Despite the mother's testimony that she did not witness physical abuse while she was living with her children and their father, she told employees at her children's school to contact Child Protective Services if they noticed "any marks or anything abnormal" on her children. She testified that she did so because she anticipated that the father would follow through on his threats to remove her from the home. But she conceded at trial that asking the school to be on the lookout for

4

signs of physical abuse suggested that she had reason to believe the father was abusing the children.

The mother testified that when she was forcibly evicted by the father, she could not take the children with her "because he had primary custody," apparently referring to the July 2011 court order. She also said that the "only reason he had primary custody" was that she had been sick with a double kidney infection and blood infection and had feared that she would die.

On April 25, 2012 and May 7, 2012, the Department of Family and Protective Services received referrals alleging that T.M.D., Jr. had been physically abused by his father. According to information provided by the school, T.M.D., Jr. had six fresh bruises on his arms, neck, and cheek on April 23. A week later, he arrived at school with a large bruise on his left eye and an open cut on his face. A week after that, he came to school with fresh bruises on his face, specifically his right eye. The referral also alleged that he "often shows up to school with bruises on his face and neck, dirty clothes, hungry, [and] emotionally disturbed."

Emerald Ealy, a caseworker with the Department, spoke with T.M.D., Jr. at his elementary school on April 25. The child told Ealy that when he misbehaved at home, his father whipped him with a belt. He gave various stories to explain the visible bruising on his body—including that he had been bitten by a bug or accidentally injured while playing in the park—before becoming upset and

5

withdrawn. The school's speech pathologist told Ealy that she had observed bruises on T.M.D., Jr., he was always hungry, and he was emotionally disturbed. The school nurse told Ealy that the mother was not "in the picture," and when she was involved, the children often missed school.

That same day, Ealy visited the father's house, where she saw the three younger children. She did not observe any marks or bruises on them. She did not interview the two youngest children due to their age, and she did not understand B.M.D., who is autistic. The father reported that he did not know how T.M.D., Jr. sustained his bruises. He also told her that: (1) he had been with the children since their birth; (2) he had no family support; (3) T.M.D, Jr. is speech impaired, and B.M.D. is autistic; (4) the mother is bipolar and has other health issues; and (5) he did not have contact information for the mother.

Two weeks later, another Department caseworker, Latoya Dunbar, interviewed T.M.D., Jr. at his elementary school. This time the child stated that his father punched him on his left eye and slapped him hard in the face near his right eye. The mother was unable to take the children at that time because she did not have housing and furniture. Accordingly, all four children were removed from the father's home and placed in foster care.

The Department filed suit for protection of the children, conservatorship, and termination. After an adversary hearing, the trial court entered a temporary

6

order, appointing the Department temporary managing conservator for the children. In addition, the court ordered the mother to "comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit," and notified her that "failure to fully comply with these orders may result in the restriction or termination of parental rights." In addition, the first item on the family service plan also informed the mother that failure to comply could result in termination of her parental rights:

> THIS IS A VERY IMPORTANT DOCUMENT. ITS PURPOSE IS TO HELP YOU PROVIDE YOUR CHILD WITH A SAFE ENVIRONMENT WITHIN THE REASONABLE PERIOD SPECIFIED IN THE PLAN. IF YOU ARE UNWILLING OR UNABLE TO PROVIDE YOUR CHILD WITH A SAFE ENVIRONMENT, YOUR PARENTAL AND CUSTODIAL DUTIES AND RIGHTS MAY BE RESTRICTED OR TERMINATED OR YOUR CHILD MAY NOT BE RETURNED TO YOU. THERE WILL BE A COURT HEARING AT WHICH A JUDGE WILL REVIEW THIS SERVICE PLAN.

The family service plan required, among other things, that the mother (1) participate in domestic violence classes and present a certificate of completion to the caseworker no later than 30 days from the last class, (2) participate fully in a psycho-social assessment to address her emotional and mental needs and that she follow all recommendations from the evaluation including psychological or psychiatric evaluation, individual therapy, and group therapy, (3) participate in parenting classes with an emphasis on special-needs children, and (4) obtain and

7

maintain stable housing for more than six months, which was to be safe, clean, and free of hazards and to have operational utilities.

Although the mother completed many of the services that were required by the family service plan, including maintaining employment and visitations, she did not complete all of the services. Larry Johnson, the caseworker assigned to this case, testified that the mother did not complete a "victims of domestic violence" course or a parenting class. Although she did complete a psycho-social assessment, she did not follow through with recommendations from that assessment, including psychological assessment, individual counseling, and family counseling.

Adele Countrymen, the volunteer child advocate, testified that she reviewed the services with the mother many times. She said that she had "great hopes" that the mother would "get things done," and that although the mother did "start some things," "[e]very time she started, she would stop and they would have to find another place or move to another place so the services are not completed to fulfill what should have happened probably almost, more than a year ago."

The mother conceded at trial that she had not completed all of her services. At the time of trial she had been living with a friend in a two-bedroom apartment for approximately one month. She testified that she did not have a place to live that was suitable for her children.

In addition, the record includes evidence of the mother's mental health history. The mother said she had been hospitalized five or six times for mental health issues, most recently in 2011. Her first psychiatric hospitalization was an outpatient visit when she was between the ages of 11 and 13, and her first inpatient psychiatric hospitalization was after the birth of T.M.D., Jr., when she was 17 or 18 years old. She said her diagnoses have not all been consistent. She testified that she had been previously diagnosed with ADHD, an emotional distress disorder, and "just a number of odd random things that I don't even know." However, she did recall that her most recent mental health diagnosis was "manic bi-polar major depressive disorder," which she said could be confused with another disorder that "has to do with spousal abuse or physical, verbal abuse from the spouse." The mother testified that the father verbally abused her, and she said, "In other words, he was just making me crazy."

The child advocate testified about her understanding of the mother's mental health history, and she said that she had repeatedly spoken with the mother about her mental health. The mother acknowledged that both the Department and Child Advocates had advised her to seek a mental health evaluation through MHMRA, but she did not do so and was not under the care of a mental health professional at the time of trial.

No evidence was presented that the mother's mental health issues had resolved; rather, she testified, "I just felt like I didn't need any more medication." She further explained that there were "extenuating circumstances" that had prevented her from addressing her mental health during the pendency of the case. She said she could not afford it because the monthly child support garnishment from her wages left her without enough money to pay for transportation. The child advocate testified that the mother never asked for help regarding access or transportation to medical services, and that "she just said it was too far, and she wasn't going to go there, she couldn't go there, she didn't have the money to go there, there was no reason to go there, that she was fine." The mother asserted that she knew how to take care of herself, and she said, "As far as medication goes, I no longer need medication. All I have to do is prove that to the court and that means I have to go to MHMRA which means I have to afford to go there. I cannot afford to go there and do that."

The mother testified that she worked 40 hours a week as a security guard and that if she were not obligated to pay child support, she would be "fine" financially. She also said that although her work schedule included afternoons, evenings, and weekends, she could adjust her work schedule to fit her children's school schedule. She said that her roommate, who was also a friend of many years, could pick up the children from school and watch them while she worked. But the

friend did not testify at trial and the mother conceded that no one connected to the case had met her. The mother testified that she had "looked up and researched" her children's conditions and was "already . . . familiar" with T.M.D., Jr.'s and B.M.D.'s needs. She said, "I believe I have familiarized myself enough with them and their conditions to be able to take care of them properly with their conditions." Finally, she testified that she loved her children, wanted to be reunited with them, could care for them, and hoped the court would not terminate her rights to them.

A caseworker testified about the children's special needs. T.M.D., Jr. has ADHD, mood disorder, oppositional defiant disorder, and anger management issues. B.M.D. has been diagnosed with autism, ADHD, adjustment disorder with mixed disturbance of emotion and conduct, mixed receptive expressive language disorder, borderline intellectual functioning, pica, and gross and fine motor skill delays. Z.T.D. has severe developmental, academic, and motor skills delays, which affect eating, dressing, and independent functioning. Z.T.D. is verbally and physically aggressive, has frequent temper tantrums, has been diagnosed with pervasive developmental disorder, ADHD, disruptive behavior disorder, and mild intellectual disability. E.M.D. has language, emotional, and behavioral delays, and she has been diagnosed with ADHD and borderline intellectual functioning. All four children take prescription medication for their conditions and receive therapy, counseling, or both.

11

Both the caseworker and the child advocate testified that the children were doing well and living together in their current therapeutic foster home. The child advocate described the children as "a handful," but she explained how well the children were doing since being placed in a foster home together. Though previous attempts to find adoptive parents for the children had not been successful, she testified that she believed a different approach could be successful in finding adoptive parents for the four children, and she asked the court to permit her to remain assigned to the case to help find adoptive parents.

The child advocate also opined that it was not in the children's best interest to be reunited with their parents. She said:

> My major concern is that they do not have a stable home life in which these four children need stability. Neither parent is currently living on their own, being able to pay their own bills, to provide a home. I do not believe that either parent is aware of what grade their children are in or which type of classes they are in, what needs to be done, how often they need to go to the doctor. They've never ask[ed] me. And I have checked many, many times, but I know, I know they have not. They don't know these answers, which concerns me a lot, in the fact that if you are not taking care of your own situation and you have other precarious financial situations, bringing four special needs children in is a huge risk at this time.

The trial court found by clear and convincing evidence that the mother (1) voluntarily left the children alone or in the possession of another without providing adequate support for the children and remained away for a period of at least six months, *see* TEX. FAM. CODE ANN. § 161.001(1)(C) (West 2014);

12

(2) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, *see id.* § 161.001(1)(D); (3) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, *see id.* § 161.001(1)(E); and (4) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children, *see id.* § 161.001(1)(O). In addition, the trial court found that termination of the parent-child relationship between the mother and T.M.D., Jr., B.M.D., Z.T.D., and E.M.D. was in the children's best interest. *See id.* § 161.001(2). Accordingly, the trial court entered a decree terminating the mother's rights with respect to the children.

The mother filed a request for findings of fact and conclusions of law and a motion for new trial, contesting the legal and factual sufficiency of the evidence to support the court's findings. The trial court filed findings of fact and conclusions of law, reiterating the findings included in the termination decree. After a non-evidentiary hearing, the trial court denied the motion for new trial. L.M. appealed.

**Analysis**

Termination proceedings are strictly scrutinized on appeal. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Clear and convincing evidence must support the decision to terminate parental rights. *In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex.

2002); *see also Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *J.F.C.*, 96 S.W.3d at 264; *see also Holick*, 685 S.W.2d at 20 (citing *Santosky*, 455 U.S. at 747, 102 S. Ct. at 1391)).

Because of this heightened burden of proof, both legal and factual sufficiency review of a decree terminating parental rights require a reviewing court to consider all of the evidence to determine whether the factfinder could have formed a firm belief or conviction about the truth of the matters as to which the Department bore the burden of proof. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency).

In a legal sufficiency review, we view the evidence in the light most favorable to the finding. *J.P.B.*, 180 S.W.3d at 573; *J.F.C.*, 96 S.W.3d at 266. To do this, we "consider all of the evidence, not just that which favors the verdict," *J.P.B.*, 180 S.W.3d at 573, and we "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266); *see also Jordan v. Dossey*, 325 S.W.3d 700, 712–13 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). We also "disregard all

evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *J.P.B.*, 180 S.W.3d at 573 (quoting *J.F.C.*, 96 S.W.3d at 266); *see also Jordan*, 325 S.W.3d at 712–13.

In a factual sufficiency review, we consider the entire record, including evidence both supporting and contradicting the finding. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (quoting *J.F.C.*, 96 S.W.3d at 266). "'If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.'" *Id.*

In order to justify the termination of parental rights pursuant to section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the statute's enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *C.H.*, 89 S.W.3d at 23. Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a

finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## I. Failure to comply with court order

In her fourth issue, the mother argues that the evidence was legally and factually insufficient to support the trial court's finding under Family Code section 161.001(1)(O) that she "failed to comply with the provisions of a court order that specifically established the actions necessary for [her] to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department . . . as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children." *See* TEX. FAM. CODE ANN. § 161.001(1)(O).

The mother argues that there was no evidence that the children were removed from her as a result of her abuse or neglect of them. We disagree. Chapter 262 of the Family Code does not define "neglect," but the Supreme Court of Texas has held that the definition in Chapter 261 "surely inform[s] the term['s] meaning." *In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013). Under Chapter 261, "neglect includes placing a child in or failing to remove a child from a situation that requires actions or judgment beyond his capabilities and that results in 'a substantial risk of immediate harm to the child.'" *Id.* at 246 (quoting TEX. FAM. CODE ANN. § 261.001(4)(B)(i)). Accordingly, for Chapter 262, "'abuse or neglect

16

of the child' necessarily includes the risks or threats of the environment in which the child is placed . . . [including] the harm suffered or the danger faced by other children under the parent's care." *Id.* at 248.

The mother testified that she was aware that the father was verbally and physically abusive to the children because she witnessed it and the children told her about it. She also testified that before the father removed her from the home, she asked the school to look for and report to the authorities any signs of physical abuse. She conceded at trial that this demonstrated her knowledge and awareness that her children were at risk for abuse in the father's home. The mother had joint managing conservatorship of the children, pursuant to a court order that could be enforced by a peace officer. That order gave her, among other things, the right to unsupervised periods of access to and possession of the children and the duty "of care, control, [and] protection" of the children. Although there was no evidence that the mother herself verbally or physically abused the children, there was evidence that she neglected them by disregarding a known risk of abuse and failing to remove or otherwise protect them from a situation that posed a substantial risk of immediate harm. *See E.C.R.*, 402 S.W.3d at 247–48.

There was undisputed evidence at trial that the mother failed to fully comply "with the provisions of a court order that specifically established the actions necessary for [her] to obtain the return of the children who have been in the

17

permanent or temporary managing conservatorship of the Department . . . as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children." *See* TEX. FAM. CODE ANN. § 161.001(1)(O). An order under this subsection need not bear a title stating that it is an order "to obtain return of a child"; rather, it will be sufficient under subsection (O) so long as it directs a parent to perform specific acts and advises the parent that failure to provide a safe environment within a reasonable time could result in termination of her parental rights. *See J.F.C.*, 96 S.W.3d at 277 & n.74. A trial court may direct a parent to perform specific acts by ordering her to comply with a family service plan created by the Department. *See In re G.A.*, No. 01-11-00565-CV, 2012 WL 1068630, at *4 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, pet. denied) (mem. op.); *In re A.W.B.*, No. 14-11-00926-CV, 2012 WL 1048640, *3–4 (Tex. App.—Houston [14th Dist.] Mar. 27, 2012, no pet.) (mem. op.). Partial or substantial compliance with a court order is not enough to avoid a termination finding under section 161.001(1)(O). *See In re M.C.G.*, 329 S.W.3d 674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *In re T.T.*, 228 S.W.3d 312, 319 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

The undisputed evidence at trial showed that the mother did not complete parenting classes or a course for victims of domestic violence. Most notably, she failed to obtain and maintain stable housing for more than six months. We hold

18

that the evidence of this predicate act is both legally and factually sufficient to support the trial court's finding. *J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 25; *see also* TEX. FAM. CODE ANN. § 161.001(1)(O). In light of this holding, we need not consider issues one through three, which challenge the other findings of separate predicate acts under section 161.001(1). *See A.V.*, 113 S.W.3d at 362 (only one predicate act required).

## II.    Best interest of the child

In her fifth issue, the mother argues that the evidence is legally and factually insufficient to support the trial court's determination that termination of her parental rights was in her children's best interest.

A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). In determining whether termination of a mother's parental rights was in the child's best interest, we consider several nonexclusive factors, including (1) the child's desires, (2) the current and future physical and emotional needs of the child, (3) the current and future physical danger to the child, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child, (6) plans for the child by the person seeking custody, (7) stability of the home, (8) acts or omissions of the parent that

may indicate that the parent-child relationship is improper, and (9) any excuse for acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The Department is not required to prove all of these factors, and the absence of evidence about some factors does not preclude the factfinder from reasonably forming a strong conviction that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27. Evidence establishing one of the predicate acts under section 161.001(1) may also be relevant to determining the best interest of the child. *See id.* at 28.

Several of the *Holley* factors weigh in favor of the trial court's finding that termination of the mother's parental rights was in the children's best interest. We consider the current and future physical and emotional needs of the children, which are great, the parenting ability of the mother, and the stability of the home together because they are related.

All of the children have special physical and emotional needs, including developmental, academic, and motor skills delays. They take medication and receive counseling and therapy. Although the mother was ordered to take a class on parenting special-needs children, she failed to do so. The mother testified that she had "looked up and researched" the children's conditions and believed she could properly care for them. However the child advocate testified that she did not believe that the mother knew what grades the children were in, what classes they

took, how often they needed to go to the doctor, or how to meet each child's needs. The mother also demonstrated a limitation on her parenting ability by failing to remove her four young special-needs children from an abusive situation.

Stability of the home is also a relevant factor in this case. "Stability is important in a child's emotional and physical development." *In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "Without stability, income, or a home, [a parent] is unable to provide for the child's emotional and physical needs." *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.). The mother failed to obtain and maintain stable housing for more than six months as required by the court. At trial, she testified that she did not have suitable housing for the children and had been living with a friend in a two-bedroom apartment for a month. She said that her friend would care for the children while she worked. However the friend did not testify at trial, and the mother conceded that no other person associated with the case had ever met her friend.

Finally, relating to both the mother's parenting abilities and the stability of the home, we consider the mother's mental health issues. Both the mother and the child advocate testified about the mother's history of mental illness, which has necessitated multiple hospitalizations in the past. The diagnoses included: "manic bi-polar major depressive disorder," mood disorder, major depression with psychotic features, and a suicide attempt and suicidal ideations. Yet the mother

also had a history of refusing to address her mental health issues and failing to follow through with recommended treatments. While mental illness is not a ground for parental termination, the impact of a parent's mental illness on her ability to parent and the stability of the home are relevant factors in the best interest of the child analysis. *See, e.g.*, *In re E.S.C.*, 287 S.W.3d 471, 475–76 (Tex. App.—Dallas 2009, pet. denied) (considering mental illness as factor in analysis of whether termination under § 161.001(1)(O) was in the best interest of the children); *see also Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 281 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (considering mother's potential failure to continue taking medication prescribed for mental illness as factor in best interest analysis); *cf. Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 797–98 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (applying *Holley* best interest factors in termination of parental rights under §161.003 and considering impact of parent's failure to treat mental illness on ability to provide stability and meet the needs of the child). Here, the mother failed to address mental health issues that have in the past led her to be hospitalized and to consider or attempt suicide. Such behavior subjects her children to uncertainty and instability. *See Jordan*, 325 S.W.3d at 723–24. All of these factors—the needs of the children, the parenting ability of the mother, and stability of the home—weigh in favor of the

court's conclusion that termination of the mother's parental rights was in the children's best interest.

The *Holley* factors are not necessarily the only considerations relevant to determining the best interest of the child. *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.). "[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West 2014). In determining whether a parent is willing and able to provide a safe environment, we consider several factors, including (1) the child's age and vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) willingness and ability of the child's family to seek, accept, and complete counseling services and cooperate with agency supervision; (4) the willingness and ability of the child's family to effect positive changes within a reasonable period of time; and (5) whether the child's family demonstrates adequate parenting skills. *Id.* § 263.307(b). Evidence establishing one of the predicate acts under section 161.001(1) also may be relevant to determining the best interest of the child. *See C.H.*, 89 S.W.3d at 28.

Here, all of these factors weigh in favor of the trial court's decision. The children were 4, 5, 6, and 7 years old at the time of removal, and they had special needs that made them entirely dependent on others for care. The mother has a

history of allowing her children to remain in an abusive situation. She has not followed through with services, shown a willingness to affect positive changes in a reasonable time, or demonstrated adequate parenting skills to address the specific needs of these children. Considering all of the evidence in light of the *Holley* and statutory factors relevant to a determination of the best interest of the children, we conclude that a reasonable factfinder could have formed a firm belief that termination of the mother's parental rights was in the best interest of T.M.D., Jr., B.M.D., Z.T.D., and E.M.D. We hold that the evidence was legally and factually sufficient to support the trial court's best interest finding, and we overrule this issue.

## Conclusion

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Chief Justice Radack and Justices Massengale and Huddle.