Opinion issued February 22, 2007




















In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00243-CV

____________


KAY ADAMS, Appellant


V.


TEXAS DEPARTMENT OF FAMILY & PROTECTIVE SERVICES,
Appellee






On Appeal from the 315th District Court

Harris County, Texas

Trial Court Cause No. 2004-07607J






O P I N I O N

 In this accelerated appeal, (1) appellant, Kay Adams, challenges the trial court's
decree, entered after a bench trial, terminating her parental rights to her two minor
children. In four issues, Adams contends that the evidence is legally and factually
insufficient to support the trial court's findings that (1) she knowingly placed or
knowingly allowed her children to remain in conditions or surroundings which
endangered their physical or emotional well-being; (2) (2) she engaged in conduct or
knowingly placed her children with persons who engaged in conduct which
endangered their physical or emotional well-being; (3) (3) she has a mental or emotional
illness or a mental deficiency which renders her unable to provide for the physical,
emotional, and mental needs of her children; (4) and (4) termination of her parental
rights was in the best interest of the children. (5)

 We affirm.

Factual and Procedural Background

 In September 2004, the Texas Department of Family and Protective Services
("DFPS") took temporary custody of Adams's two minor children, who were living
with Adams at the Houston Area Women's Shelter, after Adams made a false call for
emergency assistance. After officers responded to the call, Adams volunteered to be
admitted to the Ben Taub Psychiatric Ward. DFPS subsequently filed its petition to
terminate Adams's parental rights to her two children. (6)

 During the trial, Adams testified that Shazizz Mateen is the father of both
children and she had two pregnancies prior to the births of the two children. Her first
pregnancy, which occurred in her late teens, ended upon a "self inflicted gunshot
wound" to her stomach, which she described as a suicide attempt. At the time that
she inflicted the gunshot wound, Adams was not aware that she was pregnant. Her
second pregnancy ended in a "voluntary termination." Adams has criminal
convictions for unlawfully carrying a weapon and misdemeanor theft. Since 1999,
she has moved residences approximately twelve times, living for periods of time in
Galveston, Houston, and Louisiana.

 While pregnant with the older child, Adams was living with Mateen, and he
would physically abuse her. The domestic violence continued "off and on" after the
child was born, and Adams called for emergency assistance several times. After the
second child's birth, Adams and Mateen separated. Adams explained that although
the children were in the house during the episodes of physical abuse, they never
witnessed Mateen strike or abuse her. She stated that Mateen was in jail because he
sexually assaulted her.

 Adams further testified that she felt as though she had made progress during
the one and one-half of a year that her children had been in foster care pending the
trial. Although she was not stable at the time of trial, she told the trial court that she
was "getting there" and "doing the best to [her] ability." She stated that her monthly
income was about six or seven hundred dollars and, if her children were returned to
her, she would "go ahead and make sure that every requirement is met, to go ahead
and make sure that day care is set up, anything that [DFPS] is requiring for [her] to
have been and be in place with no questions asked." Adams admitted that she has a
mental illness, but she wanted her parental rights not to be terminated so that she
could have more time to "step up to the plate." 

 Mandi Norris, a clinical psychologist, testified that she began serving as
Adams's individual therapist on December 14, 2004. Based on a psychological
evaluation provided to Norris, she expanded Adams's treatment goals to include
addressing her history of "psychotic symptoms," "working to help her develop
improved coping skills," and improving "her parenting skills and trying to work with
her in identifying her risk factors for parenting issues, parenting problems, and
developing psychotic symptoms." Adams had been inconsistent in attending therapy
sessions, making it difficult to monitor her psychological functioning. 

 Norris explained that Adams, who had been diagnosed with "Psychotic
Disorder NOS," had not accepted her mental illness and that acceptance of a mental
illness is a necessary first step in making progress. Although Adams had "made some
progress in acknowledging that she has had some psychotic episodes," she still "had
some delusional beliefs" and "tactile hallucinations." While under Norris's treatment,
Adams was hospitalized three times during a ten-month period. First, in January
2005, she was hospitalized "on a mental health warrant because she was found
running into the street and claiming that she was having electricity running through
her body." Then, on June 24, 2005, she was hospitalized after she was found
standing still in traffic as if she were in a trance, and finally, on October 28, 2005, she
was hospitalized when family members were concerned that "[s]he had reportedly
stopped taking her psychotropic medication regimen and she had stopped taking care
of her hygiene."

 Norris further testified that she was concerned because Adams's psychiatric
symptoms had not stabilized over the course of her treatment and Adams's most
recent psychiatric hospitalization may have been precipitated by Adams's
discontinuing her medication regimen. Norris explained that it is very important for
a person with symptoms like Adams's "to be very consistent in adhering to their
medication regimen." To Norris's knowledge, Adams was supposed to be taking
various medications to treat psychotic and depressive symptoms. She explained that
when such an individual stops taking their medication, she is susceptible to the
reoccurrence of psychotic symptoms. Further complicating the matter, Adams had
denied to Norris that she had had psychotic symptoms in the past. Norris testified
that she would have concerns about someone with these types of symptoms caring for
children. 

 In her most recent therapy report provided to DFPS, Norris indicated that
Adams had made "minimal" to "moderate" progress in reaching her stated treatment
goals. In regard to several goals specifically relating to Adams's parenting failures,
the report indicated that Adams had made "minimal" progress. Adams had "great
difficulty understanding how her psychological functioning and some of the decisions
that she made stemming from her psychological problems could affect the children." 
Moreover, she did not seem to understand the impact it had on the children and felt
as though she had been a "very good mother." Based on Adams's recent
hospitalizations, Norris expressed concern over Adams's failure to regularly attend
therapy and whether she was complying with her medication regimens. Norris
explained that Adams was not in a position at the time of trial to care for her children
based on her recent and past history of psychotic symptoms and psychiatric
hospitalizations. Norris could not recommend that the children live with Adams and
explained that, although it may be possible for Adams at some point to be fit as a
parent, it would be dependent on many variables and, importantly, her own insight
into her mental illness.

 Daniel J. Neuls, a licensed professional counselor, testified that he had been
meeting with the two children every other week for forty-five minute sessions since
December 2004. Initially, the younger child told Norris that his uncle had shot his
father. Later, he told Neuls that the reason that he said this was because "he wanted
to get to know his father" and "didn't know who he was." The older child only
"vaguely talked about her father." When he began working with the children, Neuls
became concerned that they had experienced some kind of trauma. Part of Neuls's
concern stemmed from the fact that when the younger child told him that his uncle
had murdered his father, he "said it very matter of factly," and that usually children
who have been in traumatic situations tend to become "numb" to those types of
experiences. Additionally, the younger child told Neuls about a "fire inside of him." 

 Neuls discussed the older child's "issues with having her hair washed,"
bathing, and coming into contact with water. Once, while he was talking with her
foster parents over the phone, Neuls heard the child making "extremely loud
screaming, banging sounds as if she was rolling on the floor." She was also making
defiant statements, "'I am not going to do it.' 'I don't want to.' 'This is crazy.'" As
a result of that episode, the child was admitted to IntraCare hospital for approximately
ten days. In discussing the reasons for her temper tantrums involving water, the child
told Neuls that "she had been tied down and held in a sewer line or something . . . like
a sewage line." She later retreated on her story, saying that it was not true. 
Additionally, the child told Neuls that she frequently had nightmares about either
being murdered or people chasing her. She also felt bad for her mother because she
was "not in a stable place" and they were always moving from place to place.

 Neuls attempted to schedule several family sessions with Adams, and, on the
single occasion when he was able to meet with Adams, Adams and the children
interacted well with each other. During the session, Adams told Neuls that the
children's uncle did not murder Mateen and explained that she had "left where she
was from and come to Houston due to a domestic violence situation." Neuls told the
trial court that children tend to take on the same behaviors as their parents, either
directly or indirectly, consciously or subconsciously. As a result, he noted that
Adams's behavior could affect the way the children view the world, view themselves,
and interact with other individuals. He also noted that moving from place to place
several times negatively affects the consistency and stability that a child needs. Since
he began working with the children, Neuls has seen progress in their development,
and their tantrums and nightmares have decreased. Neuls further testified that "these
children need to stay in a consistent, stable, and nurturing environment," and, if
unable to provide this environment, Adams's parental rights should be terminated.

 Ginger Tenorio, the court-appointed guardian ad litem for the children, testified
that during the approximately one and one-half of a year that she had been on this
case, the children displayed numerous behavioral problems. Tenorio had previously
recommended to the trial court that the children be placed with Dorothy Williams, the
sister of Shazziz Mateen. During the time that the children lived with Williams, both
did well, improved in school, appeared happy, and seemed to have bonded with
Williams. Tenorio explained that "moving from place to place, and being placed in
shelters is not stable for [the children]." During the trial, Tenorio was concerned
about Adams's stability because she "seems to be sometimes not focused during the
proceedings and makes outbursts or speaks out of turn and has denied that fact that
she has any . . . mental illness." Tenorio also expressed concern about Adams
potentially knowing the children's whereabouts because while the children were in
foster care, Williams told Tenorio that Adams showed up at her home unannounced. 
Tenorio explained that she did not believe it was in the children's best interest to have
any further contact with Adams, due to her behavior being "damaging to the children
emotionally and physically." She recommended to the trial court that it was in the
best interest of the children that Adams's parental rights be terminated, and that they
"be in a safe, stable, nurturing environment . . . in their current placement."

 Nicole Newsome, a DFPS caseworker assigned to the children, testified that
since she had been on this case in October 2004, Adams had not completed her DFPS
service plan. Although Adams had attended all of her services and completed the
parenting classes, she had not demonstrated significant progress during counseling. 
Furthermore, in July 2005, Adams told Newsome that her doctor had discontinued her
medications, but Newsome found this to be false. Newsome stated that both children
had told her that it is their desire to remain with Williams, but she was not aware of
the children's desires concerning possible contact with Adams. Newsome further
testified that terminating Adams's parental rights and allowing the children to be
adopted by Williams was in the best interest of the children. 

 Dorothy Williams testified that the children were placed in her care in August
2005. She stated that the children are "doing great" and that the older child is doing
well in school, but the younger child has "some behavioral problems" that they are
working on. Williams explained that she loves the children and, if their biological
parents'rights were terminated, she would adopt them and provide a home for them
until they are grown. She expressed concern that if Adams's parental rights were not
terminated, Adams would make false allegations that Williams was abusing the
children.

 Following the bench trial, the trial court signed a decree, terminating Adams's
parental rights to the children on the following grounds:

10.1 The Court finds by clear and convincing evidence that
termination of the parent-child relationship between . . . Kay
Adams and the children, . . . the subject of this suit is in the
children's best interest.


10.2 Further, the Court finds by clear and convincing evidence
that . . . Kay Adams has: 


 10.2.1 knowingly placed or knowingly allowed
the children to remain in conditions or
surroundings which endanger the
physical or emotional well-being of the
children, pursuant to § 161.001(1)(D) of
the Texas Family Code; (7)


 10.2.2 engaged in conduct or knowingly placed
the children with persons who engaged
in conduct which endangers the physical
or emotional well-being of the children,
pursuant to § 161.001(1)(E) of the Texas
Family Code; (8)


 10.2.3 The Court finds that . . . Kay Adams has
a mental or emotional illness or a mental
deficiency that renders the mother unable
to provide for the physical, emotional,
and mental needs of the child[ren] and
will continue to render the mother unable
to provide for the children's needs until
the 18th birthday of the children, despite
at least six months of reasonable efforts
to return the children to the mother,
pursuant to § 161.003 of the Texas
Family Code. (9)


Statement of Points

 In her third issue, Adams contends that the evidence is legally and factually
insufficient to support the trial court's finding that she has a mental or emotional
illness or a mental deficiency that renders her unable to provide for the physical,
emotional, and mental needs of her children. See Tex. Fam. Code Ann. § 161.003
(Vernon 2002). In her fourth issue, Adams contends that the evidence is legally and
factually insufficient to support the trial court's finding that termination of her parental
rights is in the best interest of the children. See id. §§ 161.001(2), 161.003(a)(5)
(Vernon 2002 & Supp. 2006). 

 In response, DFPS argues that because the statement of points filed by Adams
in the trial court did not inform the trial court that she intended to challenge the
sufficiency of the evidence supporting the trial court's findings under subsections (1)
through (4) of section 161.003(a) of the Family Code, (10) section 263.405(i) of the
Family Code (11) precludes our review of any issue concerning those findings. See id.
§ 263.405(i) (Vernon Supp. 2006). It also contends that Adams's statement of points
was not "specific enough" in regard to the trial court's finding that termination of her
parental rights was in the children's best interest.

 The Texas Family Code requires that an appellant file, not later than the 15th
day after the date a final termination order is signed, "a statement of the point or points
on which the party intends to appeal." Id. § 263.405(b) (Vernon Supp. 2006). Section
263.405(i), effective for appeals filed after September 1, 2005, provides,

The appellate court may not consider any issue that was not specifically
presented to the trial court in a timely filed statement of the points on
which the party intends to appeal or in a statement combined with a
motion for new trial. For purposes of this subsection, a claim that a
judicial decision is contrary to the evidence or that the evidence is
factually or legally insufficient is not sufficiently specific to preserve an
issue for appeal.


Id. § 263.405(i). Adams timely filed her notice of appeal after September 1, 2005, and
section 263.405(i) applies to this appeal.

 A court may order termination of a parent-child relationship in a suit filed by
DFPS if the court finds that,

(1) the parent has a mental or emotional illness or a mental deficiency
that renders the parent unable to provide for the physical,
emotional, and mental needs of the child;


(2) the illness or deficiency, in all reasonable probability, proved by
clear and convincing evidence, will continue to render the parent
unable to provide for the child's needs until the 18th birthday of
the child;


(3) the department has been the temporary or sole managing
conservator of the child of the parent for at least six months
preceding the date of the hearing on the termination held in
accordance with Subsection (c);


(4) the department has made reasonable efforts to return the child to
the parent; and


(5) the termination is in the best interest of the child.


Id. § 161.003(a) (emphasis added). 

 Here, Adams timely filed in the trial court her statement of points; however, she
did not include in her statement her intent to challenge the legal and factual
sufficiency of the evidence supporting the trial court's findings under subsections (1)
through (4) of section 161.003(a). See id. Thus, under the express terms of the
statute, we cannot consider her contention that the evidence is legally and factually
insufficient to support the trial court's findings under subsections (1) through (4) of
section 163.003(a). See id. § 263.405(i).

 Although Adams, in her statement of points, did inform the trial court of her
intent to challenge the legal and factual sufficiency of the evidence supporting the trial
court's finding that termination of her parental rights was in the best interest of the
children, DFPS contends that "it does not appear the challenge was specific enough"
and her fourth issue "is not preserved for this court's review."

 In paragraphs nine and ten of her statement of points, Adams notified the trial
court that: 

9. There is no evidence to support the court's finding that termination
of [Adams's] parental rights is in the best interest of the child[ren].


10. The evidence is factually insufficient to support the court's finding
that termination of [Adams's] parental rights is in the best interest
of the child[ren].


These paragraphs do more than merely raise a general claim of legal and factual
insufficiency, which is barred by the statute. See id. § 263.405(i). Adams did not
generally state that the evidence is "factually or legally insufficient" to support the
trial court's "decision" to terminate her parental rights. Rather, she specifically
informed the trial court that the evidence is legally and factually insufficient to support
its findings that the termination was in the best interest of the children. Her statement
of points was specific enough to allow the trial judge to correct any erroneous findings
on the challenged grounds. See In re A.J.H., 205 S.W.3d 79, 80 (Tex. App.--Fort
Worth 2006, no pet.). Moreover, given that termination statutes are to be construed
strictly in favor of the parent, we are prohibited from construing the statute in a way
that liberally expands its reach and therefore favors DFPS. See id. at 81. Accordingly,
we address Adams's fourth issue, in which she contends that the evidence is legally
and factually insufficient to support the trial court's finding that termination of her
parental rights was in the best interest of the children.

Best Interest of the Children

 In her fourth issue, Adams argues that the evidence is legally and factually
insufficient to support the trial court's finding that termination of her parental rights
was in the best interest of the children because, although several witnesses testified
that termination of her parental rights would be in the children's best interest, "none
of the witnesses stated that if [Adams] stayed on her medication and continued to
receive counseling and therapy, that she could still not provide the stability and
nurturing environment that they thought was necessary for the children." (12)

 A parent's right to "the companionship, care, custody, and management" of her
children is a constitutional interest "far more precious than any property right." 
Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982). The United
States Supreme Court has emphasized that "the interest of parents in the care, custody,
and control of their children--is perhaps the oldest of the fundamental liberty interests
recognized by this Court." Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060
(2000). Likewise, the Texas Supreme Court has also concluded that "this natural
parental right" is "essential," "a basic civil right of man," and "far more precious than
property rights." Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). Consequently,
termination proceedings must be strictly scrutinized, and "involuntary termination
statutes are strictly construed in favor of the parent." Id. 

 Because termination "is complete, final, irrevocable, and divests for all time that
natural right . . . the evidence in support of termination must be clear and convincing
before a court may involuntarily terminate a parent's rights." Id. (citing Santosky, 455
U.S. at 747, 102 S. Ct. at 1391; Richardson v. Green, 677 S.W.2d 497, 500 (Tex.
1984)). Clear and convincing evidence is "the measure or degree of proof that will
produce in the mind of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (Vernon
2002); In re J.F.C., 96 S.W.3d 256, 264 (Tex. 2002). Because termination findings
must be based upon clear and convincing evidence, not simply a preponderance of the
evidence, the Texas Supreme Court has held that the traditional legal and factual
standards of review are inadequate. In re J.F.C., 96 S.W.3d at 264-66. 

 In conducting a legal sufficiency review in a termination-of-parental-rights case,
we must determine whether the evidence, viewed in the light most favorable to the
finding, is such that the fact finder could reasonably have formed a firm belief or
conviction about the truth of the matter on which the State bore the burden of proof. 
See id. at 266. In viewing the evidence in the light most favorable to the judgment,
we "must assume that the fact finder resolved disputed facts in favor of its finding if
a reasonable fact finder could do so," and we "should disregard all evidence that a
reasonable fact finder could have disbelieved or found to be incredible." In re J.P.B.,
180 S.W.3d 570, 573 (Tex. 2005) (citing In re J.F.C., 96 S.W.3d at 266). 

 In conducting a factual sufficiency review in a termination-of-parental-rights
case, we must determine whether, considering the entire record, including both
evidence supporting and evidence contradicting the finding, a fact finder reasonably
could have formed a firm conviction or belief about the truth of the matter on which
the State bore the burden of proof. Id.; In re C.H., 89 S.W.3d 17, 25 (Tex. 2002). We
should consider whether the disputed evidence is such that a reasonable fact finder
could not have resolved the disputed evidence in favor of its finding. In re J.F.C., 96
S.W.3d at 266-67. "If, in light of the entire record, the disputed evidence that a
reasonable fact finder could not have credited in favor of the finding is so significant
that a fact finder could not reasonably have formed a firm belief or conviction, then
the evidence is factually insufficient." Id. at 266. 

 In determining whether termination of Adams's parental rights was in the
children's best interest, we may consider several factors, including (1) the children's
desires, (2) the current and future physical and emotional needs of the children, (3) the
current and future physical danger to the children, (4) the parental abilities of the
person seeking custody, (5) whether programs are available to assist the person
seeking custody in promoting the best interests of the children, (6) plans for the
children by the person seeking custody, (7) the stability of the home, (8) acts or
omissions of the parent that may indicate that the parent-child relationship is not
proper, and (9) any excuse for acts or omissions of the parent. Holley v. Adams, 544
S.W.2d 367, 371-72 (Tex. 1976); In re L.M., 104 S.W.3d 642, 647 (Tex.
App.--Houston [1st Dist.] 2003, no pet.). The Holley factors are not exhaustive, and
there is no requirement that DFPS prove all factors as a condition precedent to parental
termination. See In re C.H., 89 S.W.3d at 27.

Desires of the Children

 Although the children did not testify at trial, Nicole Newsome, a DFPS
caseworker, testified that both children indicated their desire to remain with Dorothy
Williams. Also, Ginger Tenorio, the guardian ad litem, stated that the children
appeared to have bonded with Williams and seemed happy. The record does not show
whether the children desire to have future contact with Adams. This factor
demonstrates that termination of Adams's parental rights is in the best interest of the
children.

Current and Future Physical and Emotional Needs of the Children

 There is ample evidence that it would be in the children's best interest to be
raised in a consistent, stable, and nurturing environment. Both children have unique
emotional issues. The older child has issues with water, having her hair washed, and
frequently has nightmares about either being murdered or people chasing her. The
younger child has behavioral problems and at one point told a counselor that his uncle
had shot his father and that he had a "fire inside of him." Daniel J. Neuls, a counselor,
testified that he has seen progress in the children's development since they were
removed from Adams's care, with their tantrums and nightmares decreasing. Also,
Williams testified that the children appeared to be making progress since they had
been living with her.

 Adams has a history of frequently moving residences and failing to provide the
children with a stable and nurturing environment. Also, doctors and counselors
testified regarding Adams's mental health problems, including her failure to complete
her DFPS service plan, her minimal progress in addressing her parenting failures, the
"suicide" attempt while pregnant, repeatedly going to hospitals and calling for
emergency assistance, and the possibility that she could discontinue taking her
medication--all potentially posing a serious threat to the well-being of her two young
children. Finally, Mandi Norris, Adams's therapist, stated that she could not
recommend that the children live with Adams, and Tenorio and Newsome both
testified that termination of Adams's parental rights would be in the children's best
interest. This factor demonstrates that termination of Adams's parental rights is in the
best interest of the children.

Current and Future Physical Danger to the Children

 Although the record does not show any evidence of physical abuse toward the
children, there is evidence that Adams has been unable to provide the children with
a consistent and stable residence and that she was physically abused while the children
were inside the home. Additionally, Adams's potential failure to continue taking her
prescribed medication regimen poses a danger to the children. This factor
demonstrates that termination of Adams's parental rights is in the best interest of the
children.

Parental Abilities of Person Seeking Custody

 Adams is not seeking custody of the children and is only contesting the
termination of her parental rights. In regard to the parental abilities of Williams, both
the guardian ad litem and DFPS caseworkers indicated that Williams will be able to
provide a stable and nurturing home. This factor demonstrates that termination of
Adams's parental rights is in the best interest of the children.

Programs Available to Assist Person Seeking Custody in Promoting the Best
Interests of the Children


 There is no evidence of programs available to Williams to assist in promoting
the best interests of the children. This factor demonstrates that termination of
Adams's parental rights is not in the best interest of the children.

Plans for Children by Person Seeking Custody

 Williams indicated that she loves the children and will continue to provide for
them until they are adults. This factor demonstrates that termination of Adams's
parental rights is in the best interest of the children.

Stability of the Home

 Adams has moved residences approximately twelve times since 1999. On the
other hand, both the guardian ad litem and DFPS caseworkers indicated that Williams
will be able to provide a stable and nurturing home. This factor demonstrates that
termination of Adams's parental rights is in the best interest of the children.

Acts or Omissions of Parent that May Indicate that the Parent-Child Relationship
is Not Proper


 There is evidence that Adams has made several false calls for emergency
assistance, has not provided a stable home for the children, and has a mental illness
that she has not fully accepted. This factor demonstrates that termination of Adams's
parental rights is in the best interest of the children.

Excuse for Acts or Omissions of Parent

 Other than Adams's mental illness, there is no evidence of any excuses for any
of her acts or omissions. This factor demonstrates that termination of Adams's
parental rights is in the best interest of the children.

 In sum, a fact finder could have formed a firm conviction or belief that
termination of Adams's parental rights was in the children's best interest. 
Accordingly, we hold that the evidence is legally and factually sufficient to support
the trial court's finding that termination of Adams's parental rights was in the best
interest of the children.

 We overrule Adams's third and fourth issues.


Conclusion

 Section 161.003 provided the trial court with an independent basis upon which
to terminate Adams's parental rights, and the evidence is legally and factually
sufficient to support the trial court's finding that termination of Adams's parental
rights was in the best interest of the children under section 161.003(a)(5). 
Accordingly, we need not address Adams's first two issues, in which she contends that
the evidence is legally and factually insufficient to support the termination of her
parental rights under section 161.001(1)(D) and (E).

 We affirm the decree of the trial court. 



 Terry Jennings

 Justice


Panel consists of Chief Justice Radack and Justices Jennings and Bland.
1. See Tex. Fam. Code Ann. § 263.405(a) (Vernon Supp. 2006). 
2. Id. § 161.001(1)(D) (Vernon Supp. 2006).
3. Id. § 161.001(1)(E) (Vernon Supp. 2006). 
4. Id. § 161.003(a)(1)-(5) (Vernon 2002). 
5. Id. §§ 161.001(2), 161.003(a)(5) (Vernon 2002 & Supp. 2006). 
6. The motion filed by DFPS requested termination of the parental rights of both Adams
and the children's father, Shazizz Mateen. Mateen is not a party to this appeal. 
7. Tex. Fam. Code Ann. § 161.001(1)(D).
8. Id. § 161.001(1)(E). 
9. Id. § 161.003. 
10. See id. § 161.003(a)(1)-(4).
11. See id. § 263.405(i) (Vernon Supp. 2006).
12. We note that in her fourth issue, Adams contends that the evidence is legally and
factually insufficient to support a finding that termination of her parental rights was
in the children's best interest under section 161.001(2). See id. § 161.001(2). 
Because a finding that "the termination is in the best interest of the child" is also an
element required for termination under section 161.003, we treat Adams's fourth issue
as also challenging the sufficiency of the evidence under 161.003, which Adams
addresses in her third issue. See id. § 161.003(a)(5).