**Opinion issued July 31, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00113-CV

———————————

## IN THE INTEREST OF A.S., A CHILD

———————————

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-00087J**

———————————

## MEMORANDUM OPINION

This is an appeal from the termination of the parental rights of a mother, C.L.H., with respect to her daughter, A.S. *See* TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012). On appeal, the mother argues that the evidence is legally and factually insufficient to support the trial court's findings that she committed a

1

predicate act required for termination and that termination was in her daughter's best interest.

We affirm.

## Background

When A.S. was born on January 4, 2013, both she and her mother tested positive for opiates and barbiturates. The hospital notified the Department of Family and Protective Services, which was already acquainted with the mother by reason of its involvement in cases involving her older children who were not living with her the time A.S. was born. The Department took the newborn A.S. into foster care. An affidavit sworn by a caseworker for the Department and filed in support of removal stated that the mother had taken hydrocodone, a narcotic pain medication, during pregnancy against medical advice. The caseworker attested that she was informed by an assistant to the mother's primary care physician, Dr. Tanveer Syed, that the mother had called the office to request a hydrocodone refill, but the doctor refused to call in the prescription based upon the belief that the mother was pregnant. The staffer also communicated that hydrocodone is "absolutely not to be taken" during pregnancy, and that Dr. Syed "had great concerns" that the mother "had a problem with pain medication."

The affidavit also explained the mother's prior history with the Department involving her older children. This included physical abuse to a daughter, who was

2

injured as an infant when the mother had an argument with that child's father. The affidavit stated that parental rights were terminated with respect to that child, who was adopted. Another incident involved sexual abuse to another daughter perpetrated by the mother's then-boyfriend. The affidavit stated that the mother was "not willing to protect the children and not have [the boyfriend] around the children and continues to allow him to live in the home." As a result of that incident, the mother relinquished her parental rights to six of her children, who were placed with a family member. Finally the affidavit stated that the mother's rights were terminated as to another baby for neglectful supervision based on allowing the father of that child to care for her, despite his history of sexually abusing another child.

At a show-cause hearing, the caseworker testified that A.S. was the mother's tenth child and she had voluntarily relinquished her parental rights to three of those children. In addition, both the mother and the baby tested positive for hydrocodone when A.S. was born. The mother told the caseworker that she had a prescription and showed her an empty bottle, but the doctor's assistant told the caseworker that the mother's hydrocodone prescription was "not valid."

The evidence at the show-cause hearing focused on whether the mother had a valid prescription for hydrocodone and whether she had lied to her doctor about terminating her pregnancy in order to obtain the medication. Dr. Syed testified that

3

she initially prescribed hydrocodone to the mother as a pain reliever for a tooth abscess. Medical records admitted at the show-cause hearing showed that the mother had a positive pregnancy test several months earlier, but she had informed the doctor that she intended to terminate the pregnancy. The records also showed that, contemporaneous with the initial hydrocodone prescription, she informed the doctor that she was not pregnant and was using birth control pills. Dr. Syed testified that the mother did not appear pregnant at the time when she was seen for the tooth abscess. The doctor also testified that the mother informed her that she had terminated the recent pregnancy.

Dr. Syed said she would "probably not" have prescribed hydrocodone to the mother if she had known she was still pregnant, testifying that hydrocodone is "a category three substance where no ill effects are known of the hydrocodone but there are category B drugs . . . like Tylenol or ibuprofen" that could have been given. When questioned by the court, Dr. Syed agreed that the mother lied about the abortion to obtain hydrocodone.

The mother also testified at the show-cause hearing. She denied lying to Dr. Syed about being pregnant or having had an abortion, saying that her pregnancy was visible by that time. The mother also denied specifically asking Dr. Syed to prescribe hydrocodone, testifying that she simply told the doctor that she was in pain and needed antibiotics for an infection. The mother saw Dr. Syed twice in

4

September 2012, just over two weeks apart, and Dr. Syed gave her two prescriptions, each for 40 pills of hydrocodone. The mother testified that she used a total of 58 pills over a six-week period, "as needed for pain." She stated that the doctor did not advise her that hydrocodone could harm an unborn child.

The mother also admitted taking phenobarbital and Tegretol during her pregnancy, both prescribed by Dr. Syed, to prevent seizures from which she had suffered since childhood. She did not know of any side effects of phenobarbital and did not recall if the accompanying product literature advised the patient to seek medical advice with regard to use of the medication during pregnancy.

According to the mother, A.S. was "perfectly fine . . . perfectly healthy and normal," and the hospital social worker believed that A.S. should have been allowed to leave the hospital with her. The mother testified that she was prepared to care for an infant—she had a car seat, a crib, clothes, diapers, and an apartment. The father of A.S. also testified at the show-cause hearing. He said that he lived with the mother, worked as an auto mechanic, supported the mother, and would be able to help care for the baby if she were returned home.

The trial court and the attorney ad litem discussed the mother's credibility, specifically noting that she testified that she would never give up a baby despite having previously relinquished her parental rights to several other children. The court named the Department as temporary managing conservator.

The Department created a family service plan which required the mother to take numerous actions including therapy, drug testing, parenting classes, attending hearings and meetings, maintaining housing, remaining drug-free, demonstrating financial responsibility, visiting her child, and completing 90 days of inpatient drug treatment. The plan made clear that her ability to visit with A.S. depended on her participation in services. The mother refused to sign the family service plan or participate in most services, and in March 2013, the trial court approved the family service plan and incorporated it into a status hearing order "as if set out verbatim." The court ordered the mother "to timely comply with each and every task of that family service plan." The status hearing order also stated:

> THIS COURT ADVISES THAT THE FAMILY SERVICE PLANS, APPROVED AND INCORPORATED BY THIS ORDER AS SET FORTH ABOVE, SPECIFICALLY ESTABLISH THE ACTIONS NECESSARY FOR THE PARENTS TO OBTAIN RETURN OF THE CHILD WHO IS IN THE TEMPORARY MANAGING CONSERVATORSHIP OF THE DEPARTMENT, AND THIS COURT FURTHER ADVISES THE PARENTS THAT FAILURE TO FULL[Y] COMPLY MAY RESULT IN THE RESTRICTION OR TERMINATION OF HIS OR HER PARENTAL RIGHTS.

Although the mother refused to complete most of the services included in the family service plan, she did submit to drug testing in January, March, and July 2013. The January hair follicle test was positive for phenobarbital and hydrocodone; the March test was positive for barbiturates, codeine, hydrocodone,

and morphine; and the July test was positive for barbiturates and benzodiazepines (oxazepam, nordiazepam, and temazepam).

Meanwhile, A.S. thrived in foster care and became bonded to her foster family. The Department maintained a primary goal of unrelated adoption and a concurrent goal of relative adoption.

The termination hearing was tried to the court in January 2014. The mother's family service plan, the status hearing order incorporating the family service plan, the mother's drug test results, the mother's and child's medical records, and the transcript from the show-cause hearing were admitted without objection. The court also admitted the two doctor's reports that were previously admitted at the show-cause hearing.

The father testified that he had been in a relationship with the mother and lived with her for four years, which included the time when she relinquished her parental rights to her older children. He was aware that the mother had a problem with cocaine in 2011, before she became pregnant with A.S., but no further information or testimony about the nature, extent, or duration of, or any treatment for or rehabilitation from this problem was introduced.

Yet the father denied that the mother had a problem with prescription drugs. Although he could not identify all of the medications the mother was taking, he testified that she went to doctors to obtain prescriptions and did not take any drugs

that were not prescribed to her. He also testified that he attended prenatal medical appointments with the mother and that he was present when she saw Dr. Syed. He testified that on the occasion when Dr. Syed prescribed hydrocodone, the mother did not tell the doctor she was going to have an abortion and did inform the doctor that she was pregnant. Nevertheless, on cross-examination, the father agreed that it would not be "healthy" for the mother to take hydrocodone while pregnant and that he believed she was "wrong" to do so.

The father also provided testimony that tended to show the parents' readiness for the return of their child. He testified that he and the mother had lived in the same apartment for more than three years. Photographs taken the day before trial showed the condition of the apartment, which was clean, tidy, and furnished. They also showed baby supplies, clothing, and food. He said the apartment was "very much ready" for the baby. He testified that they had a bed for the baby, but he acknowledged that he had not assembled it because it was "stressful" to see the empty crib. He also testified that they had a car seat, diapers, clothing, food, and other baby supplies.

Finally, the father testified about the relationship of the mother to A.S. and his stability as a wage-earner. He said that A.S. responded "very well" to the mother during the parents' sole visit with the child since her birth, which occurred approximately one month before trial. The father testified that the mother was "a

8

very good mother" who behaved appropriately and treated A.S. "like a little queen" during the visitation. The father worked for himself in a mobile mechanic business he had owned for 14 years, and the mother helped him with business paperwork. All of the father's drug tests were clean, and he denied using illegal drugs.

The Department's caseworker testified that she had been to the mother's apartment, and she conceded that it was appropriate and contained baby items and food. She also conceded that the mother told her that she had valid prescriptions for her medications.

However, the caseworker painted a different picture regarding the interactions between the parents and A.S. during their sole visitation. She testified that A.S. was not bonded to the mother:

> The baby was a little bit upset and crying. The parents had some trouble consoling her. The father at one point made a video of her crying and played it back to her so that she could hear herself crying. And then the mother ended up giving the baby . . . to one of the staff members who was able to comfort the baby till she stopped crying.

The caseworker also testified that the parents did not cooperate with the Department during the pendency of the case and had completed none of their services. As a result of their failure to participate in services, they were allowed only one visit with A.S. The child was living in a foster home, and she was "very, very bonded" to the foster mother, who wanted to adopt her. The caseworker

believed it would be in the best interest of the child for the court to terminate the mother's parental rights.

Finally, the mother testified. She denied having taken any drug for which she did not have a valid prescription. Her "Patient Prescription Record" from a retail pharmacy was admitted into evidence. The records showed that from January 2013 to January 2014, the pharmacy filled more than 85 individual prescriptions for the mother for a variety of medications, including narcotic and non-narcotic pain relievers, antibiotics, and anti-seizure medications. The majority of these medications were prescribed by three doctors.

The mother said that when she appeared for hair follicle drug testing, she was never asked if she was on prescription medication. She said she tried to show her prescriptions to the technician but was told that because the court and the Department knew she had evidence of her prescriptions, "then that was fine." The mother testified that all the positive drug tests during the pendency of this case were due to her use of prescribed medications. She testified that she takes phenobarbital and Tegretol, also known as carbamazepine, to control seizures, from which she had suffered since childhood. She testified that she was hospitalized in September 2013 for a miscarriage, and that she was given hydrocodone in the hospital and discharged with a prescription for acetaminophen

and codeine. She also testified that she used hydrocodone for pain after giving birth to A.S.

She acknowledged using hydrocodone during her pregnancy for pain associated with a tooth abscess, but she again denied telling the doctor that she had terminated a pregnancy. To the contrary, she said, "I told her I was pregnant." She testified that she did not know the side effects of hydrocodone on pregnancy, the doctor did not discuss that with her, she did not read the pamphlets that came with the medication, and she did not think there was any reason not to take it.

Because the mother broadly denied having taken any drug for which she did not have a prescription, the attorney ad litem asked the mother about a positive drug test for cocaine in December 2011, which was before the mother became pregnant with A.S. The mother denied having used cocaine and testified that she had been drugged by an acquaintance, saying a subsequent drug test was "clean." The positive drug test result for cocaine from December 2011 was admitted into evidence.

The mother conceded that she did not complete the services in her family service plan, even though her visitation with A.S. was predicated on her doing so. She said she did not comply with the family service plan because she did not do anything wrong. Finally, she asked for a chance to parent her child, suggesting that

the Department "can stay in my life" "still supervising me," and noting that she previously parented her older children.

The trial court terminated the mother's parental rights on grounds of endangerment (§ 161.001(1)(E)), abandonment (§ 161.001(1)(N)), and failure to comply with a court order (§ 161.001(1)(O)), and it appointed the Department sole managing conservator. The mother appealed, challenging the legal and factual sufficiency of the evidence to support the court's termination decree.

**Analysis**

In four issues, the mother challenges the legal and factual sufficiency of the evidence supporting the judgment terminating her parental rights with respect to A.S. Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's right to the care, custody, and control of her child is a precious liberty interest protected under the Constitution. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000); *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982). Accordingly, termination proceedings are strictly scrutinized on appeal. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Clear and convincing evidence must support the decision to terminate parental rights. *In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002); *see also Santosky*, 455 U.S. at 747–48, 102 S. Ct. at 1391–92.

Under the clear-and-convincing-evidence standard, evidence is legally sufficient if it is "such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof." *J.F.C.*, 96 S.W.3d at 265–66; *see* TEX. FAM. CODE ANN. § 101.007 (West 2008) (defining clear and convincing evidence). We review "the evidence in the light most favorable to the judgment," meaning that we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. "If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *Id.* "In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses." *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *S.W. Bell Media, Inc. v. Lyles*, 825 S.W.2d 488, 493 (Tex. App.—Houston [1st Dist.] 1992, writ denied)); *see City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

Under factual sufficiency review, we must "determine whether 'the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *In re A.B.*, No. 13-0749, 2014 WL 1998440, at *3 (Tex. May 16, 2014) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in

13

light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. In making this determination, we must undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *C.H.*, 89 S.W.3d at 26.

In proceedings to terminate the parent-child relationship, the Department must establish that one or more of the acts or omissions listed in Family Code section 161.001(1) occurred and that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001. Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *A.V.*, 113 S.W.3d at 362. In this case, the trial court based the termination of the mother's parental rights on the predicate grounds of endangerment, *see* TEX. FAM. CODE ANN. § 161.001(1)(E), constructive abandonment, *see id.* § 161.001(1)(N), and failure to comply with a court order, *see id.* § 161.001(1)(O).

## I.      Failure to comply with a court order (§ 161.001(1)(O))

The mother argues that the evidence is legally and factually insufficient to support the trial court's decree under subsection (O). She argues that A.S. was not removed for abuse or neglect because she had a valid prescription for the hydrocodone that she used during pregnancy and because the doctor testified at the show cause hearing that there are no known ill effects of hydrocodone. Section 161.001(O) provides that a court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE ANN. § 161.001(O). The Supreme Court has held that, as pertinent to section 161.001(O), the words "abuse or neglect" are "used broadly" and necessarily include "the risks or threats of the environment in which the child is placed." *In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013). The Court explained that "[p]art of that calculus includes the harm suffered or the danger faced by other children under the parent's care." *Id.* Thus "a reviewing court may examine a parent's history with other children as a factor of the risks or threats of the environment." *In re K.N.D.*, 424 S.W.3d 8, 10 (Tex. 2014).

15

Here the affidavit of removal details the mother's involvement with the Department and her history of abuse or neglect of her older children. Thus, we conclude that, without regard to whether the mother's prescription for hydrocodone was valid or her use of the hydrocodone actually harmed her baby, A.S. was removed for abuse or neglect. *See id.*; *E.C.R.*, 402 S.W.3d at 248.

The evidence is undisputed that the mother failed to comply with the provisions of the court order adopting the family service plan "in full . . . as if set out verbatim." The mother refused to sign the plan and refused to participate in services because she believed that she had done nothing wrong. In light of our conclusion that A.S. was removed for "abuse or neglect" and the undisputed evidence that the mother did not comply with the court-ordered family service plan, and viewing the evidence both in the light most favorable to the judgment and in a neutral light, we conclude that a factfinder could have formed a firm belief or conviction that the mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of A.S. *See* TEX. FAM. CODE ANN. § 161.001(O). We hold that the evidence is legally and factually sufficient to support the court's termination decree on the grounds of § 161.001(O). *See J.F.C.*, 96 S.W.3d at 265–66. Accordingly, we need not consider the mother's other arguments as to § 161.001(E) or (N). *See A.V.*, 113 S.W.3d at 362.

## II.    Best interest of the child (§ 161.001(2))

The mother also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationship was in the child's best interest. In determining whether termination of the mother's parental rights was in the child's best interest, we consider several nonexclusive factors, including (1) the child's desires, (2) the current and future physical and emotional needs of the child, (3) the current and future physical danger to the child, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child, (6) plans for the child by the person seeking custody, (7) stability of the home, (8) acts or omissions of the parent that may indicate that the parent-child relationship is improper, and (9) any excuse for acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The Department is not required to prove all of these factors, and the absence of evidence about some factors does not preclude the factfinder from reasonably forming a strong conviction that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27. Evidence establishing one of the predicate acts under section 161.001(1) may also be relevant to determining the best interest of the child. *See id.* at 27–28.

## A. Child's desires and plans for the child

The first *Holley* factor, the child's desires, is neutral or slightly favors termination of the mother's parental rights. First, A.S. was only a year old and was too young to testify about her desires. *See In re T.G.R.-M.*, 404 S.W.3d 7, 16 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "The young age of the child render[s] consideration of the child's desires neutral." *In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.). However, there was some evidence to show that A.S. was "very, very bonded" to her foster mother who wished to adopt her, whereas the mother had visited with A.S. only once since her birth and A.S. was not bonded to her. *See Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Because the evidence shows a lack of emotional bond between the mother and her infant child, it weighs slightly in favor of termination. *See id.* The sixth *Holley* factor, plans for the child by the person seeking custody, is related to the first factor and weighs in favor of the court's decree. There is no specific evidence as to the mother's plans for A.S. She has visited with her only once since her birth. However, the caseworker testified that the baby is well bonded to her foster mother, who wishes to adopt her.

**B.     Needs of the child, mother's parenting abilities, and stability of the home**

The second, fourth, and seventh *Holley* factors are all related in our consideration of the best interests of this child. The second factor considers current and future physical and emotional needs, while the fourth considers the parental abilities of the person seeking custody. The evidence showed that A.S.'s needs were being met in her foster care placement and that she was "very, very bonded" to her foster mother, who wished to adopt her. This is some evidence that A.S.'s current and future emotional and physical needs would be appropriately met by termination of the mother's parental rights. *See In re S.T.*, 127 S.W.3d 371, 379 (Tex. App.—Beaumont 2004, no pet.) (considering that foster placement that met children's needs and plans for unrelated adoption were some evidence that termination of parental rights was in the children's best interest). Conversely, although there was evidence that the mother and father had purchased items for A.S., it was undisputed that neither parent provided any material support to the child during the pendency of litigation.

In addition, and encompassing the factor of the parental abilities of the person seeking custody, we must consider the evidence that the mother had no fewer than nine older biological children, none of whom lived with her. Moreover, the mother had significant prior involvement with the Department in regard to her older children, and she had a history of relinquishing her parental rights to her

children. "Stability is important in a child's emotional and physical development." *T.G.R.-M.*, 404 S.W.3d at 17. The seventh *Holley* factor is the stability of the home, and to the extent that factor is commonly interpreted to encompass a parent's ability to provide the child with food, clothing, and shelter, *see id.*, it would appear to weigh in favor of the mother. Here there was evidence that she had been in a stable relationship with the father of A.S. for several years, had an "appropriate" apartment, and was prepared with tangible items needed to care for a child, like a car seat, baby bed, clothing, food, and diapers.

However, under both our legal and factual sufficiency standards of review, we also must give consideration to the undisputed evidence of the mother's prior history with the Department and prior relinquishments of many of her biological children. "An adult's future conduct may be somewhat determined by recent past conduct." *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Thus, a reasonable factfinder could have considered the risk to A.S. created by the mother's history of instability in parenting her older children.

## C. Physical danger to the child

The third factor is the current and future physical danger to the child. *Holley*, 544 S.W.2d at 371–72. The evidence showed that the child was born with hydrocodone in her system, but there was no other evidence adduced at trial

specifically relevant to current or future danger to the child at the time of trial. This factor is neutral.

**D.      Availability of assistance**

The fifth *Holley* factor is whether programs are available to assist the person seeking custody in promoting the best interests of the child. The mother refused to participate in any services offered by the Department and ordered by the court. This had the effect of depriving A.S. of an opportunity to bond with her mother, because the mother's visitation was contingent upon her participation in the family service plan. The caseworker testified that the mother was wholly uncooperative throughout the pendency of the case. The mother asked the court to give her a chance to parent A.S. under the Department's supervision, yet nothing in the record indicates that she is, or has ever been, receptive to such involvement such that any programs available through the Department would weigh in favor of maintaining the parent-child relationship between the mother and A.S.

**E.      Parental acts and omissions**

Finally, we consider the eighth and ninth factors together. These factors consider acts or omissions of the parent that indicate the parent-child relationship is improper, as well as any excuses therefor. *Holley*, 544 S.W.2d at 372. The majority of the testimony in this case centered on the mother's use of prescription drugs during pregnancy and during the pendency of this case.

21

The State argues that the mother's prescriptions were not valid because she lied to the doctor about her pregnancy in order to obtain a narcotic pain reliever when she was pregnant. Some evidence supports this theory. For example, Dr. Syed testified at the show-cause hearing, and her records admitted at trial reflected that the mother had told her she planned an abortion and was not pregnant. Dr. Syed testified that she would not have prescribed hydrocodone if she had known the mother was pregnant.

Both the mother and father testified that she did not lie to the doctor, told the doctor she was pregnant, and was visibly pregnant at the time Dr. Syed examined her and prescribed hydrocodone. However, it was for the judge as finder of fact to resolve this disputed question of fact based on its determination of the credibility of the witnesses. *See HTS Servs.*, 190 S.W.3d at 111. We defer to the trial court's inherent assessment of credibility in favor of the doctor. *See id.*

The mother also provided prescription drug records and argued that because the medications had been prescribed by a physician, she did nothing wrong by using the medication. But her physician testified to the contrary at the hearing, by observing that the mother affirmatively misrepresented her medical condition to obtain narcotics. To the extent that the prescriptions may have been valid in the sense that they were written by a doctor after examining a patient and for the treatment of a medical condition, i.e., a painful tooth abscess, that does not address

22

the concern in this case. The evidence adduced at the hearing would allow a factfinder to reasonably conclude that the mother affirmatively misled the doctor in order to obtain a prescription for narcotic pain reliever, the use of which may have subjected her unborn child to harm.

Finally, the evidence raised another significant omission for which there is no evidence of an excuse. The mother refused to work toward completion of her family service plan despite knowing that her ability to visit with A.S. depended on her doing so and that failure to do so could result in termination of her parental rights. By refusing to work on the family service plan services, she deprived A.S. of an opportunity to bond with her and subjected her to the risk of termination of her mother's parental rights. This is not a case of "a parent's imperfect compliance with the plan." *In re S.M.R.*, No. 12-0968, 2014 WL 2535986, at *7 (Tex. June 6, 2014). The mother did not "fall short of strict compliance with a family-service plan's requirements," she simply refused to work any services at all. *See id.* Her only excuse for this omission was that she believed she did nothing wrong by taking hydrocodone.

Viewing all the evidence in the light most favorable to the judgment, we conclude that a factfinder could have formed a firm belief or conviction that termination of the mother's parental rights was in A.S.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(2); *J.F.C.*, 96 S.W.3d at 265–66. Viewing the same

23

evidence in a neutral light, the disputed evidence is not so significant as to prevent a factfinder from forming a firm belief or conviction that termination of the mother's parental rights was in A.S.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(2); *J.F.C.*, 96 S.W.3d at 265–66. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of the mother's parental rights was in A.S.'s best interest. We overrule the mother's fourth issue.

## Conclusion

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Justices Jennings, Bland, and Massengale.